T.C. Memo. 2008-230

UNITED STATES TAX COURT

LOIS WIENER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17984-04.                    Filed October 14, 2008.

<u>Larry Kars</u>, for petitioner.

<u>Shawna A. Early</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  This case arises under section 6015[1] from petitioner's request for relief from joint and several liability for unpaid Federal income tax liabilities for 1979, 1980, and

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

1981 (1979-81 tax liabilities).  Respondent determined petitioner was not entitled to relief.  Petitioner timely petitioned the Court to review respondent's determination.  The issue for decision is whether respondent correctly determined that petitioner was not entitled to relief under section 6015(b) or (f).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and supplemental stipulation of facts are incorporated herein by this reference.  Petitioner resided in New York when her petition was filed.

Background

Petitioner and Jay Wiener (Mr. Wiener) were married in 1952. As of the date of trial, they were still married.  On the date of trial petitioner was 75 years old, and Mr. Wiener was 75 years old.  Both have a history of health problems.  Mr. Wiener's medical condition sends him to the hospital for several days at a time approximately twice each year.

Petitioner graduated with a bachelor of arts degree from Syracuse University in 1951.  Her course work did not include accounting, finance, or math classes.  From 1951 through 1954 petitioner worked in the customer service department of AT&T.  In 1954 petitioner became a full-time homemaker.  Petitioner remained a full-time homemaker until around the time of trial,

when she began selling clothing from her home. Petitioner relied on Mr. Wiener to take care of family financial and tax matters, including the management of the Loismae Wiener Trust,[2] a trust created by petitioner's mother. Petitioner was a beneficiary of the trust, and Mr. Wiener was the trustee.

During the years at issue Mr. Wiener owned his own business, which was the principal source of support for him and for petitioner. At some point during this period, Mr. Wiener's business began to experience cashflow problems, and he started taking funds from the Charles Wiener Trust.[3]

As of the date of trial, Mr. Wiener was in the process of closing his business because it had not generated income for 2 or 3 years. On the date of trial, the Wieners' cashflow consisted primarily of Social Security payments, funds from the Loismae Wiener Trust, and funds from the Charles Wiener Trust.

_____

[2]The Last Will and Testament of petitioner's mother, Hazel Kellmanson, which created the Loismae Wiener Trust, gave Mr. Wiener, in his discretion as trustee, the power to distribute income and principal to petitioner during her lifetime for her support, maintenance, and general welfare.

[3]The Charles Wiener Trust apparently was a testamentary trust created by Mr. Wiener's father. Mr. Wiener's mother was the trustee. Over a time period that is undefined in the record, Mr. Wiener received approximately $290,000 from the Charles Wiener Trust. Mr. Wiener signed over some of the checks issued by the trust to his business. Mr. Wiener claims the trust payments were loans. However, the alleged loans were not memorialized by promissory notes, and Mr. Wiener made no interest payments. The trust agreement for the Charles Wiener Trust was not introduced into evidence, so we cannot ascertain from the agreement itself the identity of the trust beneficiaries.

Petitioner had begun selling clothing from her home, and Mr. Wiener was looking for a job.

During the years in issue petitioner and Mr. Wiener maintained a joint checking account. Petitioner wrote household checks from the account, and Mr. Wiener wrote larger checks, such as those for investments or real estate taxes. When petitioner wrote household checks, she told Mr. Wiener the total amount of the checks so that he could deposit additional funds into the account if necessary. Petitioner and Mr. Wiener usually discussed large purchases before Mr. Wiener wrote checks to pay for the purchases.

The bank statements for the joint checking account were mailed to the Wieners' home address. Mr. Wiener reconciled the account and monitored the checkbook balance.

During the years at issue and in the following years, the Wieners' lifestyle was modest. Although petitioner traveled with Mr. Wiener on at least one business trip to Egypt and Mr. Wiener purchased a ring for petitioner as a 30th anniversary present, the Wieners did not take expensive vacations, nor did they purchase any other jewelry or luxury items.

Mr. Wiener was not abusive to petitioner, nor did he threaten petitioner. However, as set forth more fully below, Mr. Wiener withheld information regarding important financial and tax

matters from his wife and misled her regarding the 1979-81 tax liabilities during the period from 1979 to 2001.

Sinclair Global Arbitrage

Sometime before November 1979 Martin Bond (Mr. Bond), Mr. Wiener's accountant, introduced Mr. Wiener to Sinclair Global Arbitrage (SGA), a limited partnership, and recommended that he invest in it. Mr. Wiener attended several meetings with Mr. Bond regarding SGA, but petitioner did not.

Mr. Wiener ultimately decided to invest in SGA. On November 9, 1979, Mr. Wiener wrote two checks to SGA totaling $106,250 from the Wieners' joint checking account.[4] On May 13, 1980, Mr. Wiener wrote another check to SGA for $58,839.84. Petitioner did not sign any of the checks, nor did she know about them. Mr. Wiener did not tell his wife anything about the investment in SGA.

Mr. Wiener received a Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., for 1981, which reported that Mr. Wiener was a limited partner in SGA who owned a .8169-percent

---

[4]Mr. Wiener testified that the funds he used to make the SGA investment actually came from his business. Mr. Wiener claimed that because he had to make the investment personally, he withdrew the necessary funds from his business and deposited the funds in the Wieners' joint checking account. Although petitioner did not introduce any documentation supporting Mr. Wiener's testimony, Mr. Wiener testified that he attempted to get documentation from his bank and that the documentation was no longer available because of the passage of time.

partnership interest.  Petitioner's name did not appear on the
Schedule K-1, nor did it appear on any correspondence from SGA.

Tax Returns

Petitioner and Mr. Wiener filed joint Federal income tax
returns for 1979, 1980, and 1981.  Mr. Bond prepared the returns
from information given to him by Mr. Wiener or Mr. Wiener's
office manager.  Petitioner did not provide information for the
preparation of the tax returns to Mr. Bond, nor did petitioner
discuss the returns with Mr. Bond after he prepared them.  After
Mr. Bond prepared each year's return, he would bring the return
to Mr. Wiener's office.  Mr. Wiener signed both his name and
petitioner's name to the return and mailed it to the IRS.[5]
Petitioner did not review any of the returns for 1979, 1980, or
1981.[6]  Each of the 1979-81 returns reported an overpayment and
claimed a refund.  Petitioner did not know about the refunds, and
she did not benefit from them beyond normal support.[7]

---

[5]Petitioner states on brief that she gave Mr. Wiener her
permission to sign the returns for her, and she does not dispute
that the returns were joint returns for purposes of sec. 6015.

[6]On the questionnaire that petitioner submitted to the IRS
in support of her request for relief, she stated that she signed
the returns, but at trial she testified that she did not sign the
returns.

[7]Mr. Wiener testified that he believes he deposited the
refund checks resulting from his distributive share of the SGA
losses for 1979-81 into the Wieners' joint account and then
transferred the refund amounts to his business.

The Wieners' joint returns for 1979, 1980, and 1981 deducted SGA partnership losses of $128,789, $610,080, and $207,517, respectively. Respondent audited SGA for 1979, 1980, and 1981,[8] disallowed certain partnership deductions, and mailed a notice of deficiency to petitioner and Mr. Wiener that disallowed the SGA loss deductions and determined deficiencies for 1979, 1980, and 1981.

A petition was filed in this Court on behalf of the Wieners seeking a redetermination of the deficiencies for 1979-81, docket No. 27006-90. On July 17, 1991, the Court entered a stipulated decision in docket No. 27006-90. Petitioner did not sign the stipulated decision. In accordance with the stipulated decision, on August 23, 1991, respondent assessed income tax liabilities against the Wieners of $49,745 and $41,388 for 1979 and 1980, respectively, and on September 30, 1991, respondent assessed an income tax liability against the Wieners of $3,746 for 1981.[9]

On November 29, 1991, approximately 3 months after respondent assessed the 1979-81 tax liabilities, petitioner transferred the marital home (the Morris Lane property)[10] to the

---

[8]Petitioner was not involved in the audit, and Mr. Wiener did not tell her about it.

[9]Respondent also assessed interest for the years 1979-81.

[10]The record does not disclose how the Morris Lane property was titled before it was transferred to the Charles Wiener Trust. However, the parties to the indenture that conveyed the Morris

(continued...)

Charles Wiener Trust ostensibly in consideration for substantial sums previously advanced to Mr. Wiener by the trust. On the date of the transfer, petitioner did not know about the 1979-81 tax liabilities or that she was personally liable for them. After the transfer, petitioner and Mr. Wiener continued to live at the Morris Lane property, and they paid the mortgage and other household expenses from their joint checking account.

On January 6, 1992, respondent filed a notice of Federal tax lien against petitioner and Mr. Wiener with respect to the 1979-81 tax liabilities.

In 1998 the Wieners entered into an installment agreement with respondent to pay the 1979-81 tax liabilities. Mr. Wiener told petitioner at the time that the tax liabilities related to his business and that he would take care of them. Under the installment agreement, the Wieners were required to pay $1,800 per month no later than the 30th of each month, beginning in May 1998.[11] The Wieners generally made timely payments through June 2001. Starting in July 2001, the Wieners made installment

---

[10](...continued)
Lane property to the Charles Wiener Trust were petitioner and the Charles Wiener Trust. We infer from this that petitioner owned the Morris Lane property before the Nov. 29, 1991, transfer.

[11]The parties stipulated that payments were to begin in September 1998. However, the installment agreement lists May 30, 1998, as the first due date, and the Wieners' Certificates of Official Record for 1979 and 1980 show monthly payments starting in May 1998.

payments of $800 each month until September 2002 when they stopped making payments.

In 2001 pursuant to an agreement between the IRS and the Wieners, the Federal tax lien that had attached to the Morris Lane property was released, and the Morris Lane property was sold. Petitioner and Mr. Wiener purchased a new residence in Armonk, New York, that, under the agreement with the IRS, was titled in their joint names and was subject to the Federal tax lien. The new home was purchased with the proceeds from the sale of the Morris Lane property. The record does not contain documentation establishing who sold the Morris Lane property and in whose name the new residence was titled. However, Mr. Wiener testified that the agreement with the IRS required the new residence to be titled in the names of both petitioner and Mr. Wiener.[12]

Petitioner's Innocent Spouse Claim

In 2001 in connection with collection activities related to the 1979-81 tax liabilities, petitioner learned for the first time that the tax liabilities were attributable to Mr. Wiener's investment in SGA. At that time one of respondent's revenue

---

[12]Petitioner and Mr. Wiener reside in the new residence, and petitioner listed the residence as an asset on a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, that she submitted to the IRS on or about Mar. 28, 2005. We infer from the record as a whole that the Wieners' current marital home is titled in both of their names.

officers suggested that petitioner apply for relief from the 1979-81 tax liabilities under section 6015.  On or about March 26, 2002, petitioner filed Form 8857, Request for Innocent Spouse Relief (And Separation of Liability and Equitable Relief), on which she requested relief from joint and several liability for the 1979-81 tax liabilities pursuant to section 6015(b), (c), and (f).  On or about October 15, 2003, respondent issued a letter to petitioner informing her that her request for relief had been denied.  Petitioner filed a protest with respondent's Appeals Office.

On June 24, 2004, respondent issued a notice of determination that denied petitioner's request for relief under section 6015 for each of the years in issue.  The notice of determination was addressed to petitioner, but the salutation referenced "Ms. Nick".  The notice simply stated that "We did not find you eligible for relief" under section 6015(b), (c), or (f) and gave no indication of the analysis that the Appeals Office used or the evidence it relied on in making its determination. Petitioner timely petitioned this Court pursuant to section 6015(e) alleging that respondent's determination that petitioner was not entitled to relief for 1979-81 was in error.

On or about March 28, 2005, petitioner submitted a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, to respondent.  On the Form 433-A,

petitioner did not disclose that she had a beneficial interest in the Loismae Wiener Trust established under the will of her deceased mother,[13] nor did she disclose the existence of the Charles Wiener Trust from which Mr. Wiener had obtained substantial funds in the past to support his business. Petitioner did disclose, however, that as of March 2005 she and Mr. Wiener owned the following assets:

| Asset | Fair Market Value |
| --- | --- |
| Various bank accounts | $1,972.67 |
| Marital home | 750,000.00 |
| Furniture/Personal effects | 10,000.00 |
| Jewelry | 30,000.00 |

She also disclosed that she and Mr. Wiener had some dividend and interest income, that both she and Mr. Wiener received Social Security payments, and that the Wieners' total monthly living expenses exceeded their gross monthly income. Because petitioner and Mr. Wiener own their home and have no outstanding mortgage, their total monthly living expenses did not include any mortgage or rent payment.

At trial petitioner introduced copies of several 2005 account statements for the Loismae Wiener trust account at Charles Schwab & Co. and various checks dated in 2005 that had cleared the account. The payees on the checks included

---

[13]Petitioner, however, did disclose the existence of her beneficial interest in the Loismae Wiener Trust on her 2002 and 2004 Federal income tax returns.

petitioner, Mr. Wiener, and his business.  The value of the Loismae Wiener trust account at Charles Schwab & Co. as of March 31, 2005, was $38,535.84.

OPINION

In general married taxpayers who file a joint Federal income tax return for a taxable year are jointly and severally liable for the full amount of that year's tax liability.  Sec. 6013(d)(3); Butler v. Commissioner, 114 T.C. 276, 282 (2000). Under section 6015, however, a spouse may obtain relief from joint and several liability if the spouse satisfies certain requirements.[14]

Section 6015(a)(1) provides that a spouse who has made a joint return may elect to seek relief from joint and several liability under section 6015(b) (dealing with relief from liability for an understatement of tax on a joint return). Section 6015(a)(2) provides that a spouse who is eligible to do so may elect to limit that spouse's liability for any deficiency with respect to a joint return under section 6015(c).  Relief from joint and several liability under section 6015(b) or (c) is available only with respect to a deficiency for the year for which relief is sought.  Sec. 6015(b)(1)(D), (c)(1); see H. Conf.

---

[14]Sec. 6015 applies to tax liabilities arising after July 22, 1998, and to tax liabilities arising on or before July 22, 1998, but remaining unpaid as of such date.  Internal Revenue Service Restructuring and Reform Act of 1998 (RRA), Pub. L. 105-206, sec. 3201(g), 112 Stat. 740.

Rept. 105-599, at 252-254 (1998), 1998-3 C.B. 747, 1006-1008. If relief is not available under either section 6015(b) or (c), an individual may seek equitable relief under section 6015(f). Petitioner contends that she is entitled to full relief from liability under section 6015(b) or (f).[15]

Our jurisdiction to review petitioner's request for relief is conferred by section 6015(e), which allows a spouse who has requested relief from joint and several liability to contest the Commissioner's denial of relief by filing a timely petition in this Court.

A.   Section 6015(b)

Section 6015(b)(1) authorizes the Commissioner to grant relief from joint and several liability if the taxpayer requesting relief satisfies each requirement of subparagraphs (A) through (E). Section 6015(b)(1) provides:

> SEC. 6015(b).  Procedures For Relief From Liability Applicable to All Joint Filers.--
>
> > (1) In general.--Under procedures prescribed by the Secretary, if--
> >
> > > (A) a joint return has been made for a taxable year;
> > >
> > > (B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;

---

[15]The parties agree that petitioner does not qualify for relief under sec. 6015(c) because she is still married to Mr. Wiener.

(C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

(D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

(E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election,

then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such understatement.

The requirements of section 6015(b)(1) are stated in the conjunctive. Therefore, if the requesting spouse fails to meet any one of them, she does not qualify for relief. <u>Alt v. Commissioner</u>, 119 T.C. 306, 313 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004).

Except as provided by section 6015, the requesting spouse bears the burden of proving that she satisfies each requirement of section 6015(b)(1).[16]  See Rule 142(a); <u>Jonson v.</u>

---

[16]Sec. 7491(a) shifts the burden of proof in cases arising in connection with examinations commencing after July 22, 1998. RRA sec. 3001(c)(1), 112 Stat. 727. Because respondent's examination of the Wieners' returns began before July 22, 1998,

(continued...)

<u>Commissioner</u>, 118 T.C. 106, 113 (2002), affd. 353 F.3d 1181 (10th Cir. 2003). Respondent concedes that petitioner meets the requirements of subparagraphs (A) and (E) of section 6015(b)(1). However, he argues that petitioner has not satisfied the requirements set forth in subparagraphs (B), (C), or (D) of section 6015(b)(1).

1. <u>Section 6015(b)(1)(B)</u>

Section 6015(b)(1)(B) requires that the tax returns in issue contain an understatement of income tax attributable to the nonrequesting spouse. The parties agree that the understatements of income tax arose from the disallowance of SGA's partnership losses.

Petitioner argues that the investment in SGA is wholly attributable to Mr. Wiener. Respondent contends that the investment is attributable to both spouses as a jointly held investment because Mr. Wiener purchased the interest with checks from the Wieners' joint checking account. Respondent cites two of this Court's opinions to support the proposition that investments made with funds from joint bank accounts are joint investments. The cases, however, are distinguishable.

In <u>Ellison v. Commissioner</u>, T.C. Memo. 2004-57, we for several reasons held that the partnership interests in issue,

---

[16](...continued)
sec. 7491 does not apply.

which were purchased with joint funds, were jointly owned.  The requesting spouse had agreed to invest jointly with her husband in the partnerships.  Id.  The partnership interests were purchased with joint funds and were held in joint name.  The partnerships treated the requesting spouse as a partner, as evidenced by the Schedules K-1 and other partnership documents.  Id.

Similarly, in Capehart v. Commissioner, T.C. Memo. 2004-268, affd. 204 Fed. Appx. 618 (9th Cir. 2006), we held that the partnership interests in issue, which were also purchased with joint funds, were jointly owned.  Both spouses signed the partnership's subscription agreement and selected the joint ownership option provided on the agreement.  Id.; see also Abelein v. Commissioner, T.C. Memo. 2004-274.  The requesting spouse in Capehart was actively involved in the investment.  She wrote checks to pay for the investment, made telephone calls regarding the investment, and received and reviewed partnership documents.  Capehart v. Commissioner, supra; see also Abelein v. Commissioner, supra.

Petitioner had no involvement with or knowledge of SGA when Mr. Wiener invested in it.  Petitioner did not write any checks to or communicate with SGA.  Mr. Wiener did not tell petitioner about the SGA investment until approximately 20 years after the investment was made, and petitioner was not otherwise aware of

the SGA investment.  Furthermore, SGA did not address any communications to petitioner, and the 1981 Schedule K-1, the only one in evidence, was issued solely in Mr. Wiener's name.

Petitioner testified that she did not know about the SGA investment until she learned about it as the result of contacts that were made in approximately 2001, more than 20 years after Mr. Wiener had invested in SGA, by an IRS employee who was trying to collect the unpaid tax liabilities.  We accept as credible petitioner's testimony regarding when she first learned about the SGA investment.  We also accept as credible evidence showing that Mr. Wiener wrote the SGA checks from the Wieners' joint checking account without petitioner's knowledge and that the resulting partnership interest was registered only in his name.  Moreover, Mr. Wiener credibly testified that the funds to make the SGA investment came from his business.  We conclude on the totality of the facts and circumstances that the disallowed losses were generated with respect to an investment made by and registered to Mr. Wiener, and the tax understatements resulting therefrom were attributable to Mr. Wiener, not to petitioner.

2.   Section 6015(b)(1)(C)

Section 6015(b)(1)(C) requires a requesting spouse to prove that, when she signed the return for the year for which she is seeking relief, she did not know and had no reason to know of an understatement of tax on the return.  Based on the record, we are

satisfied that petitioner did not have actual knowledge of the understatements attributable to the SGA investment at the time Mr. Wiener signed the returns on her behalf. However, we must also decide whether, on the dates Mr. Wiener signed the 1979-81 returns on petitioner's behalf, petitioner had reason to know that the returns understated the Wieners' tax liabilities for those years.

This case is appealable, barring a stipulation to the contrary, to the Court of Appeals for the Second Circuit. Consequently, we are bound to apply the law of the circuit as summarized below. See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). The Court of Appeals for the Second Circuit has adopted the "reason to know" standard utilized in Price v. Commissioner, 887 F.2d 959 (9th Cir. 1989), revg. an Oral Opinion of this Court. See Hayman v. Commissioner, 992 F.2d 1256, 1261 (2d Cir. 1993), affg. T.C. Memo. 1992-228. A taxpayer has reason to know of an understatement if a reasonably prudent taxpayer in her position at the time she signed the return could be expected to know that the return contained the understatement. See Price v. Commissioner, supra at 965. Factors to consider in analyzing whether a taxpayer had reason to know of the understatement include: (1) The taxpayer's level of education; (2) the taxpayer's involvement in the family's business and financial

affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning the couple's finances. See Hayman v. Commissioner, supra at 1261; Price v. Commissioner, supra at 965 (citing Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63).

Our analysis of certain of the above-listed factors is generally in petitioner's favor. Petitioner was a college graduate without any business, tax, or accounting background. She paid only the household bills. Petitioner did not reconcile the joint checking account. She informed Mr. Wiener as to the total amount of the checks she wrote, and he deposited sufficient money into the account to cover the checks, if necessary. Although Mr. Wiener generally consulted petitioner when he wrote checks for larger expenditures, Mr. Wiener alone was responsible for the couple's investments and did not discuss those investments with petitioner. When petitioner finally asked Mr. Wiener about tax liabilities necessitating the 1998 installment agreement, he told petitioner that they related to his business, in which petitioner was not involved.

We also note that the Wieners' lifestyle did not improve during the years in issue, and petitioner did not benefit from

the tax refunds beyond normal support.  The Wieners did not take luxurious vacations or purchase expensive items during the years in issue or in later years.

The foregoing recitation of facts does not complete the required analysis, however.  Under Price v. Commissioner, supra, a taxpayer has reason to know of an understatement if she has a duty to inquire and fails to satisfy that duty.  The requesting spouse has a duty to inquire when she "[knows] enough facts to put her on notice that such an understatement exists."  Id. at 965.  A tax return reporting a large deduction that significantly reduces a couple's tax liability generally puts the taxpayer who joins in filing a joint return on notice that the return may contain an understatement.  See Levin v. Commissioner, T.C. Memo. 1987-67.  The requesting spouse is deemed to have constructive knowledge of the understatement if she fails to inquire.  Price v. Commissioner, supra at 965; see also Von Kalinowski v. Commissioner, T.C. Memo. 2001-21 (requesting spouse found to possess constructive knowledge of understatement where income of $370,263 was offset by losses of $228,133).

Petitioner did not prepare the tax returns, nor did she speak with Mr. Bond about any of the tax returns in issue. Petitioner did not review or sign the returns before they were filed.[17]  In so doing, petitioner abdicated her right to review

_____

[17]Although the record contains some contradictory evidence,
(continued...)

and sign her joint tax returns in favor of her husband, who did have knowledge of the SGA losses and the resulting refunds that were claimed on the returns.  A taxpayer who files a joint return with her spouse may not turn a blind eye to the joint return and thereby avoid the duty to inquire.  Price v. Commissioner, supra at 965 (citing Levin v. Commissioner, supra); see also Hayman v. Commissioner, supra at 1262.  Petitioner is charged with constructive knowledge of what she would have seen if she had examined her 1979-81 returns.  What she would have seen was the deduction of a large loss attributable to SGA on each return. Her constructive knowledge of the SGA deductions was sufficient to impose on her an obligation to inquire, but she failed to make any inquiry regarding the SGA losses claimed on the returns. Even a cursory examination of the 1979-81 joint returns would have revealed substantial overpayments that were directly attributable to the large SGA losses claimed on Schedules E, Supplemental Income Schedule, attached to the returns.  The losses significantly reduced or eliminated the Wieners' adjusted gross income in each of the years 1979-81.  A reasonably prudent person with a college-level education filing a joint return with his or her spouse would have questioned deductions of such magnitude.  See, e.g., Mora v. Commissioner, 117 T.C. 279, 289

---

[17](...continued)
we accept petitioner's testimony that she did not review or sign the 1979-81 joint returns before Mr. Wiener filed them with the IRS.

(2001) (losses that almost completely eliminated wages imposed duty to inquire).

We conclude that petitioner, under the facts and circumstances of this case, had a duty to inquire regarding the partnership losses claimed on her 1979-81 returns.  Because she failed to satisfy her duty of inquiry,[18] we find that she had reason to know of the understatements.  See Hayman v. Commissioner, 992 F.2d at 1262; Mora v. Commissioner, supra at 289.

Petitioner failed to prove that she satisfied all of the requirements of section 6015(b).[19]  Consequently, we sustain respondent's determination denying petitioner relief from joint and several liability under section 6015(b)(1).

B.    Section 6015(f)

Section 6015(f) provides an alternative means of relief for a requesting spouse who does not otherwise qualify for relief

---

[18]Because petitioner abdicated her right and responsibility to inspect her 1979-81 joint tax returns and therefore did not make any attempt to inquire regarding the SGA losses on the returns, this case is distinguishable from Friedman v. Commissioner, 53 F.3d 523 (2d Cir. 1995), affg. in part and revg. in part T.C. Memo. 1993-549.  In Friedman v. Commissioner, supra at 531, the Court of Appeals for the Second Circuit concluded that a spouse requesting relief under former sec. 6013(e), the predecessor to sec. 6015, had satisfied her duty of inquiry when she asked her husband about the propriety of deductions claimed on the joint return and was told that they came from a tax shelter but that she should not worry.

[19]Because petitioner failed to satisfy the sec. 6015(b)(1)(C) requirement, we need not address or decide whether petitioner satisfied the sec. 6015(b)(1)(D) requirement.

under subsection (b) or (c) of section 6015.  Sec. 6015(f)(2).
Under section 6015(f), the Secretary may grant equitable relief
to a requesting spouse based upon the facts and circumstances of
the requesting spouse's case.

This Court, like other Federal courts, is a court of limited
jurisdiction, and it may exercise its jurisdiction only to the
extent authorized by Congress.  Sec. 7442; Moore v. Commissioner,
114 T.C. 171, 175 (2000); Naftel v. Commissioner, 85 T.C. 527,
529 (1985).  Section 6015(e)[20] confers jurisdiction on this Court
to review a determination under section 6015(f).  It provides in
pertinent part as follows:

> SEC. 6015(e). Petition for Review by Tax Court.--
>
>     (1)  In general.--In the case of an individual
> against whom a deficiency has been asserted and who
> elects to have subsection (b) or (c) apply, or in the
> case of an individual who requests equitable relief
> under subsection (f)--
>
>         (A)  In general.-- In addition to any other
>     remedy provided by law, the individual may
>     petition the Tax Court (and the Tax Court shall
>     have jurisdiction) to determine the appropriate
>     relief available to the individual under this
>     section * * *

---

[20]Congress amended sec. 6015(e) to confirm the Tax Court's
jurisdiction over stand-alone sec. 6015(f) cases, effective with
respect to a liability arising or remaining unpaid after Dec. 20,
2006.  See Tax Relief and Health Care Act of 2006 (TRHCA), Pub.
L. 109-432, div. C, sec. 408, 120 Stat. 3061.  Because this case
involves tax liabilities remaining unpaid after Dec. 20, 2006,
sec. 6015(e) as amended by TRHCA applies.  However, our
jurisdiction in this case does not depend upon sec. 6015(e) as
amended because this is not a stand-alone case for relief solely
under sec. 6015(f), and a deficiency in tax has been asserted
against petitioner.

Regarding the standard of review that the Court applies in determining whether a taxpayer is entitled to relief under section 6015(f), we have held that we ordinarily examine the Commissioner's determination to deny equitable relief under section 6015(f) for abuse of discretion.[21]  See <u>Washington v. Commissioner</u>, 120 T.C. 137, 146 (2003); <u>Butler v. Commissioner</u>, 114 T.C. at 292.  However, in <u>Porter v. Commissioner</u>, 130 T.C. ___ (2008), a case that decided the appropriate scope of review in section 6015(f) cases, the opinion of the majority refrained from deciding any issue relating to the standard of review, <u>id.</u> at ___ n.10 (slip op. at 13 n.10), and the concurring opinion of Judge Wherry, in which seven other Judges joined, questioned whether our existing precedent was still applicable in light of the 2006 amendments to section 6015(f) and contended that a de novo standard of review is now the correct standard of review in section 6015(f) cases, <u>id.</u> at ___ (slip op. at 49-53).

We need not and do not decide herein the issue of the appropriate standard of review under section 6015(f).  We cannot apply an abuse of discretion standard because the notice of determination that is in the record did nothing more than deny

---

[21]Under this standard of review, we defer to the Commissioner's determination unless it is arbitrary, capricious, or without sound basis in fact.  <u>Jonson v. Commissioner</u>, 118 T.C. 106, 125 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).  A requesting spouse bears the burden of proving that the Commissioner abused his discretion in denying relief under sec. 6015(f).  See Rule 142(a); <u>Jonson v. Commissioner</u>, <u>supra</u> at 113.

petitioner relief under section 6015. The notice of determination did not contain any analysis or recite any factual determinations that we can review for abuse of discretion. The only analysis to which we are privy is the analysis contained in an undated "Supplemental Case Memo" that the parties stipulated was "issued by respondent's appeals officer". The "Supplemental Case Memo" states as follows:

> This case was returned from Counsel for further consideration. Counsel felt that there were inconsistencies in the analysis. Counsel also felt that the appeals determination was based on the examiner's determination and did not reflect an independent determination.

The unnamed Appeals officer then addresses the inconsistencies but does not show how he or she analyzed the factors that Rev. Proc. 2000-15, 2000-1 C.B. 447, discussed below, required the Appeals officer to consider. Because we cannot ascertain what analysis was made by the Appeals officer in reaching his or her determination that petitioner is not entitled to relief under section 6015(f), we cannot review the determination for abuse of discretion.[22] Instead, we shall examine the trial record de novo to decide whether respondent properly concluded that petitioner is not entitled to relief.

The Commissioner prescribed procedures in Rev. Proc. 2000-15, supra, that IRS personnel must use to determine whether a

---

[22]We have held that we do not remand sec. 6015(f) cases. Friday v. Commissioner, 124 T.C. 220 (2005).

requesting spouse qualifies for relief under section 6015(f).[23]
Although the notice of determination does not state that
respondent used the procedures specified in Rev. Proc. 2000-15,
supra, the Appeals officer who considered petitioner's request
for relief was obligated to do so.  In addition, this Court has
applied the procedures and analysis specified in Rev. Proc. 2000-
15, supra, in reviewing the Commissioner's determination to deny
relief under section 6015(f) in other cases.  See, e.g.,
Washington v. Commissioner, supra at 147-152; Jonson v.
Commissioner, 118 T.C. at 125-126.  In this case, both of the
parties rely on Rev. Proc. 2000-15, supra, and both parties
address the factors enumerated therein.

    1.   Rev. Proc. 2000-15, Sec. 4.01

Before the Commissioner will consider a taxpayer's request
for relief under section 6015(f), the taxpayer must satisfy the
following seven threshold conditions listed in Rev. Proc. 2000-
15, sec. 4.01, 2000-1 C.B. at 448:

> (1) The requesting spouse filed a joint return for
> the taxable year for which relief is sought;
>
> (2) Relief is not available to the requesting
> spouse under § 6015(b) or 6015(c);

---

[23]Rev. Proc. 2003-61, 2003-2 C.B. 296, which supersedes Rev.
Proc. 2000-15, 2000-1 C.B. 447, is effective for requests for
relief filed on or after Nov. 1, 2003, and for requests for
relief pending on Nov. 1, 2003, for which no preliminary
determination letter has been issued as of that date.  Petitioner
requested relief on Mar. 26, 2002, and respondent issued the
preliminary determination letter before Nov. 1, 2003; therefore,
Rev. Proc. 2003-61, supra, is inapplicable here.

(3) The requesting spouse applies for relief no later than two years after the date of the Service's first collection activity after July 22, 1998, with respect to the requesting spouse;

(4) Except as provided in the next sentence, the liability remains unpaid.  A requesting spouse is eligible to be considered for relief in the form of a refund of liabilities for:  (a) amounts paid on or after July 22, 1998, and on or before April 15, 1999; and (b) installment payments, made after July 22, 1998, pursuant to an installment agreement entered into with the Service and with respect to which an individual is not in default, that are made after the claim for relief is requested;

(5) No assets were transferred between the spouses filing the joint return as part of a fraudulent scheme by such spouses;

(6) There were no disqualified assets transferred to the requesting spouse by the nonrequesting spouse. If there were disqualified assets transferred to the requesting spouse by the nonrequesting spouse, relief will be available only to the extent that the liability exceeds the value of such disqualified assets.  For this purpose, the term "disqualified asset" has the meaning given such term by § 6015(c)(4)(B); and

(7) The requesting spouse did not file the return with fraudulent intent.

Although respondent's position is not entirely clear, respondent appears to concede that petitioner meets conditions (1), (2), (3), and (4).  Respondent, however, objects to the transfer of the Wieners' principal residence to the Charles Wiener Trust approximately 3 months after the 1979-81 tax liabilities were assessed and appears to contend that the transfer was either a fraudulent transfer between spouses, see

Rev. Proc. 2000-15, sec. 4.01(5), or a transfer of a disqualified asset, see id. sec. 4.01(6).

a.    Transfer of Assets Between Spouses

Rev. Proc. 2000-15, sec. 4.01, does not define the phrase "transferred between the spouses".  At first glance, it does not appear that a transfer of a principal residence by the requesting spouse to a trust created by or under the will of a third party (in this case, a relative of Mr. Wiener) would qualify as a transfer between spouses.  Respondent contends that the transfer was not an arm's-length transfer, was not for adequate consideration, and was not valid.  Respondent does not really explain, however, how these complaints render the transfer a fraudulent transfer between spouses within the meaning of Rev. Proc. 2000-15, sec. 4.01(5).

The transfer about which respondent complains was a transfer of the Morris Lane property, which petitioner and Mr. Wiener used as their personal residence, to the Charles Wiener Trust.  The transfer was effected by an indenture that petitioner executed on November 29, 1991, in favor of the trust.  The real property transfer report attached to the indenture recites that the transfer took the form of a sale on December 2, 1991, that it was not an arm's-length sale, and that the sale price was $320,000.  Mr. Wiener testified that the transfer was made in consideration of approximately $290,000 of "loans" the Charles Wiener Trust had

made over an undefined period of time to help finance his business.

Although we understand respondent's concern about the timing of the transfer, we reject respondent's implied argument that the transfer was a transfer between spouses as part of a fraudulent scheme by such spouses within the meaning of Rev. Proc. 2000-15, sec. 4.01(5). The transfer was not between petitioner and Mr. Wiener; it was between petitioner and the Charles Wiener Trust. Nothing in Rev. Proc. 2000-15, sec. 4.01(5), suggests that a transfer of an asset between the requesting spouse and a trust qualifies as a transfer between spouses. Although we can envision a situation where a trust might qualify as the alter ego of a spouse in certain circumstances, respondent does not argue that a transfer to the Charles Wiener Trust was the substantive equivalent of a transfer to Mr. Wiener.[24]

However, even if petitioner's transfer of the Morris Lane property to the Charles Wiener Trust could be characterized as a transfer between spouses within the meaning of Rev. Proc. 2000-15, sec. 4.01(5), we cannot conclude on the record before us that the transfer was part of a fraudulent scheme between the Wieners. We have found that petitioner, the sole owner of the Morris Lane property before its transfer to the Charles Wiener Trust, did not

---

[24]The record contains documents pertaining to the transfer of the house that were signed by Mr. Wiener's mother, who was the trustee of the Charles Wiener Trust.

know about her liability for the 1979-81 tax liabilities before she transferred the property to the trust. Petitioner credibly testified that she found out about the 1979-81 tax liabilities during the course of finalizing the 1998 installment agreement and that she did not discover the liabilities were the result of Mr. Wiener's investment in SGA until 2001.[25]

We conclude that the transfer in question was not a fraudulent transfer between spouses within the meaning of Rev. Proc. 2000-15, sec. 4.01(5), and that therefore the Rev. Proc. 2000-15, sec. 4.01(5), requirement is satisfied.

b.    Transfer of Disqualified Assets

Rev. Proc. 2000-15, sec. 4.01(6), sets forth the following threshold condition that a requesting spouse must satisfy in order to qualify for relief under section 6015(f):

_____

[25]We also note that respondent probably benefited from the transfer. We infer from the evidence that the Morris Lane property was titled in petitioner's name before petitioner conveyed it to the Charles Wiener Trust. When petitioner and Mr. Wiener wanted to sell the Morris Lane property and buy a smaller house, they had to apply for a release of the Federal tax lien that had attached to the property. In consideration for the Wieners' agreement to title their new residence in both of their names and to take title subject to the lien, the IRS released the lien on the Morris Lane property and permitted the Wieners to acquire a smaller residence. The result is that the IRS acquired an uncontested security interest in the Wieners' current residence, which is jointly owned. It is probable, depending on applicable State law, that Mr. Wiener's interest in the residence is properly subject to the lien regardless of whether petitioner qualifies for relief under sec. 6015(f). See United States v. Craft, 535 U.S. 274 (2002).

(6) There were no disqualified assets transferred to the requesting spouse by the nonrequesting spouse. If there were disqualified assets transferred to the requesting spouse by the nonrequesting spouse, relief will be available only to the extent that the liability exceeds the value of such disqualified assets. For this purpose, the term "disqualified asset" has the meaning given such term by § 6015(c)(4)(B) * * *

Section 6015(c)(4)(B)(i) defines "disqualified asset" as

any property or right to property transferred to an individual making the election under this subsection with respect to a joint return by the other individual filing such joint return if the principal purpose of the transfer was the avoidance of tax or payment of tax.

The transfer of the Morris Lane property does not meet the definition of a "disqualified asset" because it did not involve a transfer to petitioner by Mr. Wiener. Section 6015(c)(4)(B)(i) unequivocally defines "disqualified asset" as a transfer of property or right to property by a nonrequesting spouse to a requesting spouse. Because the transfer of the Morris Lane property did not meet that definition, we conclude that petitioner also satisfies the threshold requirement of Rev. Proc. 2000-15, sec. 4.01(6).

c.   Fraudulent Intent

The final threshold requirement is set forth in Rev. Proc. 2000-15, sec. 4.01(7), and is satisfied if "The requesting spouse did not file the return with fraudulent intent." Respondent makes no allegation that petitioner filed her 1979-81 joint returns with fraudulent intent, and the record does not support

such a finding even if respondent had alleged it. We conclude therefore that petitioner satisfies all of the threshold conditions for section 6015(f) relief imposed by Rev. Proc. 2000-15, sec. 4.01. We turn now to a review of the factors set forth in Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. at 448-449.

2. Rev. Proc. 2000-15, Sec. 4.03

Rev. Proc. 2000-15, sec. 4.03, provides that, in cases where the threshold conditions set forth in Rev. Proc. 2000-15, sec. 4.01, have been satisfied but the requesting spouse does not qualify for relief under Rev. Proc. 2000-15, sec. 4.02, 2000-1 C.B. at 448[26] equitable relief may be granted under section 6015(f) if, taking into account all facts and circumstances, it is inequitable to hold the requesting spouse liable. Rev. Proc. 2000-15, sec. 4.03(1) and (2), contains a list of positive and negative factors that the Commissioner will take into account in determining, on the facts and circumstances, whether to grant full or partial equitable relief under section 6015(f).[27] As Rev. Proc. 2000-15, sec. 4.03, makes clear, no single factor is

---

[26]Rev. Proc. 2000-15, sec. 4.02, 2000-1 C.B. at 448, requires that at the time relief is requested, the requesting spouse must no longer be married to the nonrequesting spouse. Petitioner and Mr. Wiener remain married; therefore, relief under Rev. Proc. 2000-15, sec. 4.02, is unavailable to petitioner.

[27]The factors that we consider in determining whether it would be inequitable for purposes of sec. 6015(f) are the same as the factors that we consider in determining whether it would be inequitable for purposes of sec. 6015(b)(1)(D). Alt v. Commissioner, 119 T.C. 306, 316 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004).

determinative in any particular case, all factors are to be considered and weighed appropriately, and the listing of factors is not intended to be exhaustive. See Washington v. Commissioner, 120 T.C. at 148; Jonson v. Commissioner, 118 T.C. at 125.

Rev. Proc. 2000-15, sec. 4.03(1), lists the following six positive factors that the Commissioner will weigh in favor of granting equitable relief:

(a) Marital status. The requesting spouse is separated * * * or divorced from the nonrequesting spouse.

(b) Economic hardship. The requesting spouse would suffer economic hardship (within the meaning of section 4.02(1)(c) of this revenue procedure) if relief from the liability is not granted.

(c) Abuse. The requesting spouse was abused by the nonrequesting spouse, but such abuse did not amount to duress.

(d) No knowledge or reason to know. In the case of a liability that was properly reported but not paid, the requesting spouse did not know and had no reason to know that the liability would not be paid. In the case of a liability that arose from a deficiency, the requesting spouse did not know and had no reason to know of the items giving rise to the deficiency.

(e) Nonrequesting spouse's legal obligation. The nonrequesting spouse has a legal obligation pursuant to a divorce decree or agreement to pay the outstanding liability. This will not be a factor weighing in favor of relief if the requesting spouse knew or had reason to know, at the time the divorce decree or agreement was entered into, that the nonrequesting spouse would not pay the liability.

(f) <u>Attributable to nonrequesting spouse</u>. The liability for which relief is sought is solely attributable to the nonrequesting spouse.

Rev. Proc. 2000-15, sec. 4.03(2), lists the following six negative factors that the Commissioner weighs against granting equitable relief:

(a) <u>Attributable to the requesting spouse</u>. The unpaid liability or item giving rise to the deficiency is attributable to the requesting spouse.

(b) <u>Knowledge or reason to know</u>. A requesting spouse knew or had reason to know * * * that the reported liability would be unpaid at the time the return was signed. This is an extremely strong factor weighing against relief. Nonetheless, when the factors in favor of equitable relief are unusually strong, it may be appropriate to grant relief under § 6015(f) in limited situations where a requesting spouse knew or had reason to know that the liability would not be paid, and in very limited situations where the requesting spouse knew or had reason to know of an item giving rise to a deficiency.

(c) <u>Significant benefit</u>. The requesting spouse has significantly benefitted (beyond normal support) from the unpaid liability * * *. <u>See</u> § 1.6013-5(b).

(d) <u>Lack of economic hardship</u>. The requesting spouse will not experience economic hardship (within the meaning of section 4.02(1)(c) of this revenue procedure) if relief from the liability is not granted.

(e) <u>Noncompliance with federal income tax laws</u>. The requesting spouse has not made a good faith effort to comply with federal income tax laws in the tax years following the tax year or years to which the request for relief relates.

(f) <u>Requesting spouse's legal obligation</u>. <u>The requesting spouse</u> has a legal obligation pursuant to a divorce decree or agreement to pay the liability.

Rev. Proc. 2000-15, sec. 4.03, provides in pertinent part that the list of positive and negative factors is a partial listing and that it is not intended to be exhaustive. Rev. Proc. 2000-15, sec. 4.03, also confirms that the Secretary may grant equitable relief if, taking into account all the facts and circumstances, it is inequitable to hold the requesting spouse liable for all or part of the unpaid liability or deficiency. Our analysis of the relevant facts and circumstances is set forth below.

### a. Positive Factors

#### i. Marital Status

Petitioner and Mr. Wiener continue to be married. This positive factor does not apply.

#### ii. Economic Hardship

An analysis of economic hardship under Rev. Proc. 2000-15, supra, is conducted using rules similar to those provided in section 301.6343-1(b)(4), Proced. & Admin. Regs. Rev. Proc. 2000-15, sec. 4.03(1)(b), 4.02(1)(c). Section 301.6343-1(b)(4)(ii), Proced. & Admin. Regs., provides that the Commissioner will evaluate a requesting individual's claim of economic hardship by considering any information offered by the individual that is relevant to the determination, including, but not limited to, the individual's income, assets and liabilities,

age, ability to earn, responsibility for dependents, the amount reasonably necessary for basic living expenses, and the allowable living expenses for the individual's geographic area.

Petitioner is 75 years old and has not been employed outside the household since 1954. Petitioner's monthly cashflow as of the date of trial came from Social Security payments and distributions from the Loismae Wiener Trust.[28] Although petitioner had begun selling clothing out of her house, the activity had not yet generated a profit.

Petitioner and Mr. Wiener's monthly expenses exceeded their monthly Social Security payments. Although petitioner and Mr. Wiener had covered their excess expenses in the past with funds obtained from the Loismae Wiener Trust and the Charles Wiener Trust, the record supports a finding that the Loismae Wiener Trust, which was supposed to be for the benefit of petitioner, had been used by Mr. Wiener, who was the trustee, as a source of funding for Mr. Wiener's business and had been reduced in value to $38,535.84 as of March 31, 2005.[29] The Wieners' primary asset is their home, which they valued at trial and in the Form 433-A that they submitted to the IRS at $750,000. Although the home is

---

[28]As of Mar. 31, 2005, the Loismae Wiener Trust had assets with a value of $38,535.84.

[29]The record does not clearly establish that the trust account at Charles Schwab & Co. was the only asset of the Loismae Wiener Trust, but we infer from the record as a whole that it was.

not encumbered by any mortgage, it is encumbered by the Federal tax lien.  As of May 2005 the unpaid tax liabilities, including interest and penalties, approximated $517,000.

Respondent argues petitioner did not prove that she will suffer economic hardship because she did not file complete information regarding her financial condition.  Respondent alleges failure in two respects:  (1) Petitioner represented on her Form 433-A that Mr. Wiener operated a business, and petitioner failed to disclose Mr. Wiener's job search, and (2) petitioner did not include the Wieners' beneficial interests in the Loismae Wiener Trust and the Charles Wiener Trust in the listing of their assets on the Form 433-A.

Petitioner submitted the Form 433-A to respondent almost a year after respondent denied her relief.  Respondent's Appeals Office could not have been misled by any alleged errors[30] on the March 28, 2005, Form 433-A regarding Mr. Wiener's employment status or petitioner's interest in the trusts when it denied her relief on June 24, 2004.

---

[30]Petitioner did not misrepresent her husband's employment status on her Form 433-A.  Checks issued from the Loismae Wiener Trust to Mr. Wiener's company prove that his business was still active at the time petitioner submitted the Form 433-A to respondent.  Additionally, the Wieners' 2002 and 2004 tax returns and the Form 433-A put respondent on notice that Mr. Wiener's business was not successful.  Mr. Wiener's lack of business income for at least 2 of 3 consecutive years and Mr. Wiener's testimony that he was finally closing his business at the time of trial are not inconsistent with either the Form 433-A that lists Mr. Wiener as a businessman or petitioner's trial testimony that Mr. Wiener was looking for a new job.

Although petitioner made at least one mistake in completing the Form 433-A dated March 28, 2005, in that she did not disclose her interest in the Loismae Wiener Trust, we do not conclude that the omission was either deliberate or misleading when all of the facts and circumstances are considered. Petitioner was required to submit, and apparently did submit, copies of her 2002 and 2004 Federal income tax returns to the IRS as part of her application for relief under section 6015. Both the 2002 and 2004 joint returns disclosed her interest in the Loismae Wiener Trust. In addition, on the Form 12510, Questionnaire for Requesting Spouse, that petitioner submitted in support of her Form 8857, petitioner filled out information regarding the Wieners' monthly income and expenses. One of the income items she listed was "Loans From Family" in the amount of $1,811.[31] Respondent's investigation of this item must have disclosed petitioner's discretionary interest in the Loismae Wiener Trust. In addition, Mr. Wiener testified that respondent was aware of the Loismae Wiener Trust because the

_____

[31]Although the description of the source and the amount was not necessarily accurate, both petitioner and Mr. Wiener described the money they received from the trusts as "loans" throughout this proceeding, and that description reflects their contention that Mr. Wiener intended the distributions to be loans. Moreover, it appears that the amount listed on the questionnaire under the heading "Loans from Family" was the amount necessary to make the Wieners' monthly cash intake equal the amount of their monthly expenses. The representation implicit in the above was consistent with proof in the record that Mr. Wiener used money from the two trusts to cover cashflow shortfalls.

Wieners offered to compromise their 1979-81 tax liabilities with funds from the trust.

Petitioner also did not fail to disclose any beneficial interest in the Charles Wiener Trust. Although the record does not contain any trust agreement or will establishing the Charles Wiener Trust, there is no evidence that petitioner is or was a beneficiary of the Charles Wiener Trust. In addition, respondent must have known of the existence of the Charles Wiener Trust as the result of negotiating the agreement with the Wieners and/or the trust for the sale of the Morris Lane property.

The totality of the facts and circumstances supports a finding that petitioner will suffer economic hardship if section 6015(f) relief is not granted. Petitioner's primary asset is her interest in her current home. Because the home is not encumbered by a mortgage, petitioner does not make any mortgage payments. Nevertheless, the monthly expenses of the Wieners exceed their monthly income. Petitioner is in her 70s and has health problems. Her husband also has serious health problems, and the complications from his treatment require hospitalization approximately twice each year.

Petitioner has no other significant source of income to pay her reasonable living expenses. Her safety net consisting of her interest in the Loismae Wiener Trust has been eroded over the years by her husband's frequent raids on trust assets and will

not likely remain available as a material source of petitioner's support for much longer. Petitioner has shown that her current monthly income and remaining assets are insufficient to meet her current level of monthly expenses and that she would experience economic hardship if she were not granted relief. This factor applies and favors granting relief.

### iii. Abuse by Nonrequesting Spouse

Petitioner admits that Mr. Wiener did not abuse or threaten her. This positive factor does not apply. Washington v. Commissioner, 120 T.C. at 149.

### iv. No Knowledge or Reason To Know

For the reasons stated in our analysis of this factor under section 6015(b), we conclude petitioner had reason to know of the items giving rise to the deficiencies and/or failed to satisfy her duty of inquiry regarding the items. This positive factor does not apply.

### v. Nonrequesting Spouse's Legal Obligation

Because petitioner is not separated or divorced from her husband, this positive factor does not apply.

### vi. Liabilities Solely Attributable to Nonrequesting Spouse

We concluded earlier in this opinion that, because Mr. Wiener was the sole investor in SGA and petitioner did not participate in making the investment, the erroneous items giving

rise to the deficiencies are solely attributable to Mr. Wiener. This factor favors granting relief.

b.   Negative Factors

i.   Attributable to the Requesting Spouse

Because the 1979-81 tax liabilities are attributable to Mr. Wiener, this negative factor does not apply.

ii.   Knowledge or Reason To Know

As discussed previously, we conclude that petitioner had reason to know of the items giving rise to the deficiencies and/or failed to satisfy her duty of inquiry regarding the items. Ordinarily, this factor would weigh heavily against granting petitioner equitable relief under section 6015(f). Rev. Proc. 2000-15, sec. 4.03(2)(b). In this case, however, Mr. Wiener intentionally withheld information from petitioner regarding the SGA investment and on several occasions actively misled her about the existence and extent of the tax liabilities. We doubt seriously whether petitioner would have received any meaningful information from Mr. Wiener about the SGA investment even if she had inspected the returns and inquired about the SGA losses. For this reason we conclude that although this negative factor applies, it is not entitled to greater weight in our analysis.

### iii. Significant Benefit

Petitioner argues she did not significantly benefit beyond normal support from the SGA investment losses giving rise to the deficiencies. Factors indicating that a taxpayer receives a significant benefit from a tax loss include paying a child's education expenses, making special purchases for the taxpayer or her family, or frequent travel. See Washington v. Commissioner, supra at 151; Monsour v. Commissioner, T.C. Memo. 2004-190. The record does not establish that petitioner enjoyed any of these benefits.

Respondent argues that petitioner benefited because the Wieners received tax refunds as a result of the reported losses. However, we have accepted as credible petitioner's testimony that she was not aware of the refunds until approximately 20 years after the Wieners received them and that she did not benefit from them. Mr. Wiener handled all deposits into the joint bank account and reconciled the account balance. Mr. Wiener testified that he believes the refunds were transferred to his business, and we see no indication that petitioner's lifestyle improved after Mr. Wiener deposited the refunds.

We conclude on the totality of the facts and circumstances that petitioner did not significantly benefit from the losses

that gave rise to the deficiencies.  This negative factor does not apply.[32]

### iv.  Lack of Economic Hardship

As discussed previously, petitioner has established that she will suffer economic hardship if relief is not granted.  This negative factor does not apply.

### v.  Noncompliance With Federal Income Tax Laws in Subsequent Years

Respondent does not argue that petitioner has untimely filed income tax returns or untimely paid any income taxes due for years after 1981.  Respondent instead contends that petitioner was noncompliant with Federal income tax laws because she transferred title to the Morris Lane property to the Charles Wiener Trust, did not disclose her beneficial interest in the Loismae Wiener Trust, stopped paying installments required by a duly executed installment agreement, and did not submit information in connection with several offer-in-compromise requests.

This negative factor focuses on whether the requesting spouse made a good-faith effort to comply with Federal income tax laws in the tax years following the years to which the request

_____

[32]We treat the fact that a requesting spouse does not significantly benefit from the item(s) giving rise to a deficiency as an additional positive factor in our analysis of whether a requesting spouse qualifies for relief under sec. 6015(f).  See, e.g., Ferrarese v. Commissioner, T.C. Memo. 2002-249.

for section 6015(f) relief related. See Rev. Proc. 2000-15, sec. 4.03(2)(e). Respondent does not assert that petitioner and Mr. Wiener failed to file all required returns or failed to pay all required taxes for years following the years at issue. Respondent's complaint focuses instead on actions that he apparently contends demonstrate petitioner's willingness to game the tax system in favor of her own economic position.

We have already addressed the disclosure issues and petitioner's transfer of the Morris Lane property. While we agree with respondent that the timing of the transfer is suspicious and was probably motivated, at least in part, by Mr. Wiener's knowledge of the resolution of the Tax Court litigation and/or the assessments that occurred in August and September of 1991, we do not find that the transfer violated any obligation to report or pay tax in years after 1981 or that petitioner knew about the assessments at the time she transferred title to the Morris Lane property. Mr. Wiener was aware of the 1979-81 tax liabilities, and we suspect that his motivation in encouraging petitioner to transfer title to the house was related, at least in part, to concerns that the IRS might seize and sell the home. However, the record does not persuade us that petitioner deliberately attempted to avoid or evade payment of a known tax liability. Mr. Wiener credibly testified that he kept petitioner in the dark regarding the SGA investment, the audit of SGA, and

the resulting Tax Court litigation. Petitioner did not sign the stipulated decision resolving the litigation. Both petitioner and Mr. Wiener testified that petitioner did not learn that she was liable for substantial income tax liabilities resulting from the SGA investment until 2001, approximately 20 years after the 1979-81 tax liabilities were assessed and approximately 10 years after petitioner transferred the Morris Lane property to the Charles Wiener Trust.

We turn then to petitioner's conduct with respect to the installment agreement. Petitioner and Mr. Wiener entered into an installment agreement in 2001 that required them to make monthly payments of $1,800. They made the required payments for several years until their financial condition worsened. Although the record is not clear, it appears that Mr. Wiener attempted to contact the revenue officer with whom he had negotiated the agreement to let him know that the Wieners could no longer afford to make the $1,800 monthly payment. In any event, the Wieners continued to make monthly payments, albeit in a reduced amount, until they stopped making payments completely in 2002 when petitioner filed her request for section 6015 relief.

We do not view these facts as establishing a lack of good-faith compliance on petitioner's part. Rightly or wrongly, petitioner relied on her husband to deal with the details of their financial and tax matters. We cannot conclude that a

failure to abide by the terms of an installment agreement in the face of financial difficulties equals a failure on petitioner's part to make a good-faith effort to comply with Federal tax laws after 1981.

We conclude that this negative factor does not apply.

### vi. Requesting Spouse's Legal Obligation

Because petitioner was not solely responsible for paying the liabilities at issue, this negative factor does not apply.

### c. Conclusion

Of the six positive factors, two factors weigh in favor of relief and four factors do not apply. Of the six negative factors, one factor weighs against granting petitioner section 6015(f) relief, and the other factors do not apply. The positive and negative factors enumerated in Rev. Proc. 2000-15, sec. 4.03, however, are not the only things we consider. We recognize that petitioner did not review her tax returns, but her failure was consistent with her apparently well-established but unwise reliance on her husband to manage their financial and tax affairs. Even if petitioner had reviewed the tax returns and inquired about the SGA losses, we believe that it is unlikely petitioner would have received the information necessary to evaluate whether to file the returns as prepared. Mr. Wiener consistently misled petitioner by not telling her about the investment in SGA and then representing to petitioner years later

that any tax issues with the IRS related to his business and would be resolved. Petitioner, who is in her 70s and has health problems, did not significantly benefit beyond normal support from the deduction of the SGA losses, and she has suffered from her reliance on her husband who in his capacity as a trustee of a trust established under the will of petitioner's mother for petitioner's benefit repeatedly took funds from the trust to cover various expenses. As of the date of trial, the trust has been reduced to less than $39,000 and will provide little security for petitioner in the future. Given petitioner's age, her health, and the financial hardship that she will experience if she is not granted relief under section 6015(f), we conclude on the totality of the record that petitioner qualifies for relief under section 6015(f) and that respondent's determination to the contrary is in error.

We have carefully considered all remaining arguments made by the parties and, to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioner</u>.