T.C. Memo. 2011-202

UNITED STATES TAX COURT

MICHELLE POUNDS, Petitioner, AND DARRYL JOHNSON, Intervenor v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30363-09.           Filed August 17, 2011.

Gregg C. Goodwin and Danielle K. Schulte, for petitioner.

Darryl Johnson, pro se.

Ann L. Darnold, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, Judge:  Intervenor seeks review of respondent's final
determination that petitioner is entitled to relief from joint

and several liability under section 6015(c)[1] with respect to a deficiency in income tax of $25,575 for tax year 2004.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Both petitioner and intervenor resided in Kansas at the time the petition and the notice of intervention were filed.

Background

Michelle Pounds (petitioner) and Darryl Johnson (intervenor) were married on April 27, 2003. The couple's marriage ended in a physical separation in May 2004, a legal separation on March 24, 2005, and finally a divorce on October 13, 2005.[2] Before and during the marriage, petitioner worked for intervenor in intervenor's automobile repossession business (company). Intervenor and petitioner started dating when petitioner was a teenager and dated off and on approximately 10 years before getting married.

---

[1]Section references are to the Internal Revenue Code of 1986 as amended and in effect at all relevant times, and/or in effect for the year at issue. Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Though the couple did not receive a divorce decree until Oct. 13, 2005, petitioner and intervenor physically separated in May 2004, when petitioner moved out of the house in which intervenor lived and ran his automobile repossession business. Petitioner initially stayed with a friend and later moved into an apartment in June 2004.

Petitioner's Role at the Company

During the taxable year at issue petitioner worked as an office manager and a secretary in intervenor's company, roles she filled before and during the marriage. Intervenor was in the automobile repossession industry and was a sole proprietor throughout all of the periods discussed in this opinion. The company was operated out of the backyard of the Peck, Kansas, home. As the office manager, petitioner's primary duty was data entry of receipts for the recovery of the automobiles; however, she also helped to repossess vehicles when necessary, make reports on the conditions of the vehicles, and talk to banks about the recovery of their automobiles.

Petitioner never held an ownership interest in the company. In her role as a secretary, petitioner was always treated as an employee of the company and was paid a salary for her work. In addition to her salary, intervenor sometimes paid petitioner lump sums of money to "stay away" after they had had an argument. All of these payments were made by checks intervenor signed using the company checking account.[3] After the separation but before the divorce, petitioner continued to work for intervenor sporadically

---

[3]Intervenor did not observe business formalities during his management of the company. Intervenor used the company account for both personal and business expenses. Even though petitioner frequently wrote checks for the company's expenses and presented them to intervenor to sign, petitioner had no signing authority on the company bank account during the tax year at issue or at any other time.

as she moved in and out of the Peck, Kansas, house depending on their relationship status at the moment.

Before and during the marriage, intervenor and petitioner rarely, if ever, discussed business or financial matters. Even though petitioner worked as a secretary, petitioner was never involved with the overall financial health or reporting of the company and was unaware of the company's financial position at any given time.[4] In fact, intervenor's stepmother, Linda Johnson, was employed with the company from its inception and, even though she had no formal accounting experience, was in charge of the company's accounting. Intervenor's stepmother testified that while in that role in 2004 as company accountant she took only 1 week off and handed the accounting books to petitioner. Upon her return, intervenor's stepmother realized that petitioner had done no accounting work, and intervenor's stepmother had to work hard to update the company's records.

Intervenor and Petitioner's Relationship

Intervenor and petitioner had a tumultuous personal relationship. The first sign of domestic violence was on October 14, 1997, 6 years before their marriage, when petitioner filed a police report with the Wichita Police Department alleging battery

---

[4]Testimony offered at trial showed that no formal financial statements were ever prepared for the company, and intervenor admitted that although he should have been, he was never concerned with the formalities of running the company, including accounting and the tax consequences of its operations.

and domestic violence by intervenor.  Despite this incident, petitioner and intervenor were married on April 27, 2003.  The relationship, however, remained rocky.  In May 2004 petitioner moved out of intervenor's home and in with a friend until she got her own apartment in June 2004.  On July 29, 2004, a second incident occurred between petitioner and intervenor after which petitioner filed an incident report with the Wichita Police Department alleging intimidation by intervenor.

A few months later, in October 2004, petitioner signed a search warrant which allowed local law enforcement officers in Peck to search the house and yard for stolen vehicles and parts.  Furious with petitioner because she allowed the police to search their house for stolen car parts pursuant to a search warrant, intervenor filed a petition for a protective order against petitioner on October 8, 2004.  On October 21, 2004, the protective order was served on petitioner, granting intervenor exclusive possession of the Peck, Kansas, home.

Intervenor and petitioner continued their relationship despite the protective order.  On November 17, 2004, intervenor and petitioner jointly signed an application for a mortgage on the house in Peck, Kansas.  However, the relationship continued to be a struggle, and, on December 1, 2004, petitioner signed a quitclaim deed which relinquished her interest in the home and gave intervenor sole possession.  On that same day and with

intervenor making the downpayment, petitioner purchased her own home in Wichita, Kansas.  At some point during the day intervenor and petitioner had an altercation that resulted in intervenor's breaking petitioner's jaw.  As a result, petitioner spent 4 days in the hospital.  Consequently, on December 3, 2004, petitioner sought a protective order precluding intervenor from entering or coming around her new Wichita, Kansas, home.  The District Court of Sedgwick County had a hearing and issued that protective order on December 16, 2004.

Despite their previous issues and the protective orders, intervenor and petitioner reunited to celebrate the Christmas holiday in 2004.  However, on March 22, 2005, trouble arose again, and petitioner filed another police report with the Wichita Police Department alleging intimidation by intervenor.

Even though they had been physically separated for 10 months at the time, the couple legally separated on March 24, 2005.  Pursuant to a separation agreement drafted by intervenor and executed on that day, petitioner retained possession of a 2003 Dodge pickup truck for which intervenor continued to make payments, and a joint restraining order was issued.  Just 7 days later, on March 29, 2005, petitioner filed another police report alleging intervenor had been shooting paintballs at her house and intimidating her with harassing phone calls.

On October 13, 2005, petitioner and intervenor were issued a divorce decree.  The divorce was uncontested, and intervenor was awarded the home in Peck, Kansas, where he lived and ran his business.[5]  The divorce decree provided that petitioner and intervenor were responsible for filing separate 2005 Federal and State income tax returns; however, the joint returns filed for tax year 2004 and prior years would continue to be the joint responsibility of petitioner and intervenor.  Consequently, intervenor testified that he and petitioner were expecting an $8,000 credit from their tax return for tax year 2003 and, pursuant to the divorce decree which mandated that they split the tax liability, they were expecting to split that refund upon

---

[5]The divorce decree was drafted by the attorney whom intervenor had used for his personal and the company's legal issues.  Neither petitioner nor intervenor contested the divorce, so they decided to use one attorney for efficiency.  However, petitioner did not seek independent counsel or know she had the right to seek independent counsel to ensure her interests were being represented and to avoid the apparent conflict of interest. Petitioner signed the divorce decree pro se, as neither party felt it was necessary to incur additional legal fees.

receipt.[6]  In addition to obtaining a divorce, both petitioner and intervenor filed for bankruptcy that month.[7]

The 2004 Income Tax Return

On February 8, 2005, the parties signed an engagement letter to hire a certified public accountant (C.P.A.) to prepare their joint 2004 income tax return (2004 return) and promised to present the C.P.A. with the complete and correct information necessary for him to prepare the 2004 return.  In April 2005 intervenor and petitioner timely requested an extension of time to file their 2004 return.  The return was untimely filed on October 17, 2005.

Because of the strains of their relationship, petitioner was unaware of the contents of the 2004 return.  Intervenor was the sole party responsible for gathering and reviewing the documents to be presented to the C.P.A. who prepared the 2004 return.  In fact, petitioner had no idea of the contents of the 2004 return and knew only that intervenor had promised that he would expedite their divorce if she promptly signed the tax return.  Intervenor

---

[6]On the 2004 return an $8,000 credit from an overpayment on the tax year 2003 return was applied to their 2004 return to reduce their 2004 tax liability.  Petitioner and intervenor received neither the refund nor the credit because they were never entitled to the credit.  Upon audit, it was conceded that the tax calculations for tax years 2003, 2004, and 2005 were erroneous, and petitioner and intervenor never had an overpayment.

[7]Intervenor paid the costs of both his and petitioner's bankruptcies.

and petitioner were divorced just 4 days before petitioner's signing the tax return.

2004 Tax Audit

The 2004 return was selected for an audit, which began in 2007 and concluded on July 7, 2008. The 2004 return reported no tax due, with the only items on the return being a $274 State income tax refund and a loss on Schedule C, Profit or Loss from Business, of $25,912 from the company totaling an overall loss for that year of $25,638. The auditor, however, determined that tax was due and made adjustments to the 2004 return, including the disallowance of Schedule C deductions of $32,564 which were claimed for interest, car and truck expenses, insurance, repairs, and other miscellaneous expenses. The auditor also determined that Schedule C income of $95,961 was unreported as was a capital gain of $19,682 related to foreclosure of a business property. In total, the auditor determined that petitioner and intervenor owed $25,575 in taxes for 2004 and $6,861.05 in interest as of August 2008. Petitioner and intervenor both agreed to the assessment of the deficiency by signing a Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment.

On July 8, 2008, intervenor and petitioner signed a Form 4549, Income Tax Examination Changes, and consented to the assessment of the tax deficiency of $25,575 as a result of the

audit.  Intervenor provided all of the information to the auditor for the examination, including all of the information regarding the business activities.  However, the record reflects that the auditor contacted petitioner regularly and unsuccessfully for records or information regarding the company.[8]  Petitioner was unable to produce any records as she never was responsible for or knew of the details of the company's finances.  Assessment was made on October 6, 2008.

Petitioner seeks relief under section 6015 from joint and several liability for the deficiency determined by audit.  On August 19, 2008, petitioner submitted timely to respondent a Form 8857, Request for Innocent Spouse Relief, seeking relief from joint and several liability under section 6015 for tax year 2004.  On October 3, 2008, intervenor signed and submitted a completed Form 12508, Questionnaire for Non-Requesting Spouse, to respondent.  On January 21, 2009, respondent made a preliminary determination that relief would be denied under section 6015(f) for that year.  Petitioner then sought Appeals review of that determination, and Appeals determined that the case should have been reviewed for relief under section 6015(b) or (c) since the

---

[8]Petitioner alleged and the audit income adjustments reflect that intervenor made kickbacks on insurance fraud relating to cars that received hail damage while in his possession.  When asked about the income he received from hail damage on the 39 vehicles, intervenor said that he and the auto repair shop worked out a "deal" in which he did not have to pay the $1,000 deductible for each car fixed.

tax resulted from an understatement of tax and an assessed deficiency.  On August 6, 2009, a second determination was made that relief was not appropriate under section 6015(b) or (c). Petitioner then submitted a Form 12509, Statement of Disagreement, which was received by respondent on September 3, 2009, but was not forwarded to the appropriate office.  However, unbeknownst to petitioner, respondent had issued a final determination letter on September 11, 2009, without considering the information submitted with petitioner's Appeals request.  On December 15, 2009, after review of the Appeals request, the innocent spouse unit issued a revised preliminary determination granting petitioner innocent spouse relief under section 6015(c). On December 22, 2009, without the knowledge that respondent had reversed his position and granted petitioner innocent spouse relief, petitioner filed a petition with this Court.  After receiving notice, intervenor filed timely a notice of intervention on April 19, 2010.

                              OPINION

    In general, spouses who elect to file a joint Federal income tax return for a taxable year are jointly and severally liable for the entire amount of tax reported on the return, as well as for any deficiency subsequently determined, even if all of the income giving rise to the tax liability is allocable to only one of them.  Sec. 6013(d)(3); Butler v. Commissioner, 114 T.C. 276,

282 (2000). Section 6015, however, provides exceptions to the general rule of joint and several liability in limited circumstances. Alt v. Commissioner, 119 T.C. 306, 311 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004).

One of those circumstances is provided for in section 6015(c). Upon the election of its application by the taxpayer, that section limits a spouse's liability for a deficiency to the portion of the deficiency properly allocable to that spouse under section 6015(d). In general, an item that gives rise to a deficiency on a joint Federal income tax return will be allocated to each individual who files the joint return in the same manner as that item would have been allocated had those individuals filed separate returns. Sec. 6015(d)(3)(A). Respondent concedes petitioner's entitlement to relief under section 6015(c). The concession presumably contemplates a section 6015(d) allocation satisfactory to both of them. However, intervenor challenges petitioner's entitlement to section 6015(c) relief.

According to intervenor, petitioner knew about the items giving rise to the 2004 deficiency, that is, the financial position of the company, including all income, deductions, and expenditures, and that knowledge disqualifies her from section 6015(c) relief. He contends that the evidence that he offered might support a finding that petitioner had "reason to know" about the understatement of tax shown on the return. See, e.g.

Price v. Commissioner, 887 F.2d 959 (9th Cir. 1989); King v. Commissioner, 116 T.C. 198, 204 (2001); Wiener v. Commissioner, T.C. Memo. 2008-230. But a requesting spouse's "reason to know" of the item is not sufficient to deny relief under section 6015(c). If, as here, all of the other requirements of that section have been satisfied, then, as relevant here, the burden of proof is shifted to the Commissioner and relief is denied to the requesting spouse only if the Commissioner "demonstrates that * * * [the requesting spouse] had actual knowledge, at the time such individual signed the return, of any item giving rise to a deficiency". Sec. 6015(c)(3)(C); Charlton v. Commissioner, 114 T.C. 333, 341 (2000); Martin v. Commissioner, T.C. Memo. 2000-346.

An issue arises where the burden of proof shifts to the Commissioner in cases when the Commissioner favors granting relief and the nonrequesting spouse intervenes to oppose it. The Court has resolved this conflict of burden shifting by determining whether actual knowledge has been established by a preponderance of the evidence as presented by all three parties. See Knight v. Commissioner, T.C. Memo. 2010-242; McDaniel v. Commissioner, T.C. Memo. 2009-137; Stergios v. Commissioner, T.C. Memo. 2009-15.

To determine whether the requesting spouse had actual knowledge, the Court looks to the surrounding facts and

circumstances for "an actual and clear awareness (as opposed to reason to know)" of the items giving rise to the deficiency.  See Cheshire v. Commissioner, 115 T.C. 183, 195 (2000), affd. 282 F.3d 326 (5th Cir. 2002).

Other than matters stipulated, respondent offered no evidence at trial.  Petitioner and intervenor each testified on his or her own behalf, and numerous documents were introduced into evidence on intervenor's behalf.  Petitioner worked for the company which intervenor ran for the tax year at issue; however, she never owned any interest in the company and performed only limited tasks.  Intervenor was solely responsible for maintaining the checking account from which the finances of the company and the home were handled.  He was the only signatory to checks drawn off of that account; had actual knowledge of the time and the manner in which the hail-damaged cars were "fixed"; was responsible for hiring and helping the C.P.A. who prepared the 2004 return using the information that intervenor prepared and gathered from the company and his and petitioner's personal records; was responsible for maintaining the financial health of the company; and was responsible for running the company. Petitioner had no actual knowledge of the items on which the deficiency was based.

In fact, petitioner had moved out of intervenor's house and had been separated from him for months when the hail-damaged cars

were fixed and for over a year when the tax return was filed. Petitioner testified that she had absolutely no idea of intervenor's business affairs at the time she signed the tax return and that her signature on the return was the only part she took in the tax return preparation.

## Conclusion

Because petitioner did not have actual knowledge of the items that resulted in the deficiency during tax year 2004, she is entitled to relief from joint and several liability for the deficiency under section 6015(c).

The Court has considered the remaining arguments of all parties for results contrary to those expressed herein and, to the extent not discussed above, finds those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioner</u>.