Janet BLISS, Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 963, Docket 94–4051.

United States Court of Appeals, Second Circuit.

Argued Feb. 13, 1995.

Decided July 12, 1995.

Stephen A. Zorn, New York City, for petitioner-appellant.

William J. Patton, Asst. Atty. Gen., Washington, DC (Gary R. Allen, Loretta C. Argrett, Ann B. Durney, Attys., Tax Div., Dept. of Justice, Washington, DC, on the brief), for respondent-appellee.

Before: OAKES, MINER and JACOBS, Circuit Judges.

JACOBS, Circuit Judge:

■ The Commissioner of Internal Revenue has asserted a tax deficiency against petitioner Janet Bliss arising out the 1982 joint tax return she signed with her former husband. Petitioner appeals from an order of the United States Tax Court (Laurence J. Whalen, *Judge*) sustaining the deficiency. Without objecting to the Commissioner's assessment or calculation of the deficiency or the penalties, petitioner argued before the Tax Court that she was entitled to relief from liability as an innocent spouse under 26 U.S.C. § 6013(e). In general, this equitable exception applies to an individual who signs a joint return that materially understates tax liability, but who does not know of the understatement, and who is not equipped by education or financial expertise, or alerted by unusual or lavish expenditures, to see through the deceit of the non-innocent spouse. In this case, the tax court found that petitioner either knew or had reason to know of the inaccuracy of the Blisses' 1982 joint return. Petitioner attacks this finding on appeal; we affirm because we conclude that it is not clearly erroneous.

## BACKGROUND

The petitioner was 21 years old when she married Howard Bliss in 1963. She had a high school education and had been living with her parents all her life. Howard Bliss earned a bachelor's degree the following year, and a law degree in 1967, and thereafter practiced law at least through the filing of the 1982 tax return in question. Other than a brief time during which she did clerical work and occasional baby-sitting, the petitioner did not work during her marriage. The Blisses had three children. In 1967, the family moved to Scottsdale, Arizona.

The tax court's findings support petitioner's contention that the family finances were Harold Bliss's responsibility throughout their marriage and that, from 1970 on, she did not even know her husband's salary. Marital discord arose in the early 1970s. Except for short reconciliations, Harold Bliss and petitioner lived apart beginning in 1973.

During the decade of separation, Harold Bliss made biweekly deposits into a joint checking account that he maintained with his wife. The biweekly support payments were $600 at first, and grew to $1200 by the early 1980s. Harold Bliss also occasionally paid other family expenses, generally deducting

these incidental payments from his regular biweekly deposits. However, in 1982, the year for which the erroneous tax return was filed, Harold Bliss paid approximately $12,500 in excess of his biweekly contributions for various insurance bills and for such teenager-related expenses as high school tuition, a trip to France, a college-scouting tour of Texas, and a wrecked automobile.

After the 1973 separation, petitioner necessarily became involved in some of the family finances. She paid the mortgage and other household bills. At the end of each year, she reported deductible expenses to her husband, and he used these figures to help prepare the couple's joint tax return.

In 1981, Harold Bliss and another lawyer formed the law firm of West and Bliss, P.A. Petitioner played no role in her husband's decision to begin his own law firm and apparently first learned of the firm's existence when she was invited to the opening reception. The Blisses' 1981 joint return reflected his earnings from the firm of $117,112.

Harold Bliss filed a petition for divorce in the Superior Court for the County of Maricopa, Arizona in January 1982. Both parties retained counsel. In the course of the divorce proceedings, the petitioner's lawyers obtained information about Harold Bliss's finances. Among the documents given to petitioner's counsel were copies of the law firm's ledger sheets for calendar years 1981 and 1982. The ledger sheets reflected payments that Harold Bliss received from his law firm—some denominated as "salary", some as "loans". The 1981 ledger indicated that Harold Bliss originally received $75,426.41 as salary and $43,660.18 as "loans". The sheet also showed that the $43,660.18 in loans was re-classified as "salary" at the end of 1981—resulting in a total 1981 salary of $119,086.59. After netting out $1,975.05 of FICA taxes, the firm treated the remaining $117,111.54 as Harold Bliss's total compensation for 1981. The Blisses reported the full $117,111.54 on their 1981 return.

The 1982 ledger received by petitioner's divorce attorney in November or early December 1982 covered the first 10 months of the year. Under "salary", it listed 10 payments of $6,000 each; under "loans", it listed

eight payments totaling $29,363.26—a total of $89,363.26 in payments for the 10 month period. Disclosures made by Harold Bliss in the divorce action reflect an assumption that his law firm would reclassify the $29,363.26 loan as salary at the end of 1982, as had been done at the end of 1981. Thus Harold Bliss stated in an affidavit filed in the divorce court that his "gross monthly pay" was $6,000. Appendix ("A.") at 44. A footnote to this statement of "gross monthly pay" declared: "Excludes periodic draws; see pre-trial statement." *Id.* The portion of the pre-trial statement prepared by Harold Bliss's attorney included the following:

> 10. For purposes of computation of spousal maintenance and of child support, the Court is asked to note that Husband's 1981 income net after payment of state and federal income taxes and F.I.C.A. withholding was $87,000.00. Gross revenue attributed to Husband's efforts and interest in the law firm of WEST & BLISS, P.A. in calendar year 1981 was $177,241.00. Therefore, his realized income was approximately 49% of gross receipts. To date, 1982 income has not been as high, attributable to the settlement of two major lawsuits and conclusion of other litigation which was ongoing during 1981. *Through September 30, 1982, gross revenue attributable to Husband's efforts and his interest in the firm was $119,398.00.* Forty-nine percent (49%) of this figure is $58,505.00. Accordingly, Husband's current average monthly income is $6,500.56 per month. Although this average is deceptive due to the recent settlement of a fairly large matter in litigation, Husband's proposal is based upon a net monthly pay of $6,500.00 per month.

A. at 56 (emphasis added). In this affidavit, Harold Bliss also indicated that he expected to be liable to the IRS for an underpayment of $9,900 at the conclusion of the tax year. A. at 61.

The couple's respective lawyers settled the divorce action on the eve of trial. One subject of their negotiations was the tax liability for 1982. In the negotiations on this subject, conducted in the presence of the clients, the negotiating lawyers contemplated that the

1982 loans might be re-classified as salary at year end, and on that basis agreed that the couple would split an anticipated additional tax liability of $11,000 in respect of that tax year. (This figure is in the region of the $9,900 liability predicted by Harold Bliss in his affidavit. A. at 61.) The allocation of possible additional tax liability between the spouses was set forth in discrete but enforceable terms in the Separation Agreement, signed on December 13, 1982:

> The parties shall file either jointly or separately for tax year 1982, as shall be to their maximum joint tax advantage. Husband shall pay all 1982 income taxes, whether federal or state, subject to reimbursement by Wife to the extent of one-half, but not to exceed $5,500.00. All federal and state taxes paid by Husband in excess of $11,000.00 shall not be reimbursable by Wife.

A. at 39. The agreement further stated:

> Each of the parties is, and has had the opportunity to become fully and completely informed of the financial and personal status of the other, and each of them has had the advice of counsel. . . .

A. at 25.

Ultimately, the law firm did *not* reclassify the 1982 loans to Harold Bliss as salary. On December 31, 1982, Harold Bliss executed a promissory note to the firm for the $32,-940.12 he supposedly borrowed in 1982. The law firm's 1982 federal tax return reflected a total salary to Harold Bliss of $71,171, a figure that did not include the supposed loan. The Blisses' 1982 joint return reported this $71,171 figure. As a result, rather than the anticipated underpayment of $11,000, the return reflected an overpayment of $6,875. Petitioner received this refund in 1983 and split it with her former husband.

After her divorce, petitioner returned to school. In September 1983, she entered a paralegal program at Arizona State University. In July 1986, she earned a bachelor's degree in business administration from Arizona State University. In May 1989 she received a law degree from the City University of New York.

On November 29, 1988, the Commissioner notified the Blisses that, based upon an audit of the 1982 return of West & Bliss P.A., the 1982 loans made to Harold Bliss were income: "In accordance with the corporate examination, the distribution of corporate funds to you is not a loan and has been included in income. Accordingly, your taxable income has been increased $32,940." A. at 19. As assessed by the Commissioner, petitioner and her former husband were therefore jointly and severally liable for a deficiency of $15,590, plus penalties and other charges. A. at 21.

Harold Bliss did not contest the notice of deficiency; however, he does not appear to have paid it. On February 27, 1989, Janet Bliss filed a petition contesting, the claim, chiefly on the ground that, as an innocent spouse, she was entitled to relief from joint liability pursuant to 26 U.S.C. § 6013(e). After a hearing, the tax court rejected this defense, finding that "the financial information that petitioner and her divorce attorneys obtained at the end of 1982 was sufficient to put [her] on notice that [Harold] Bliss's income was understated when she signed [the] couple's return." *Bliss v. Commissioner,* 1993 WL 325071, at *7, 66 T.C.M. 522 (CCH) (1993). Therefore, petitioner "either knew or had reason to know of the substantial understatement caused by [Harold] Bliss's omission of $32,940 from the gross income reported on the couple's joint return for 1982." *Id.*

.On appeal, the petitioner contends that the tax court committed clear error in finding that she knew that the 1982 joint return was inaccurate when she signed it.

## DISCUSSION

█ In general, spouses who file joint returns are jointly and severally liable for all taxes due on their combined incomes. *See* 26 U.S.C. § 6013(d)(3). This is so "regardless of the source of the income or of the fact that one spouse may be far less informed about the contents of the return than the other." *Sonnenborn v. Commissioner,* 57 T.C. 373, 381, 1971 WL 2600 (1971). The exception invoked by the petitioner—the innocent

spouse defense—is embodied in 26 U.S.C. § 6013(e), which reads in pertinent part:

(e) Spouse relieved of liability in certain cases.—

(1) In general.—Under regulations prescribed by the Secretary, if—

(A) a joint return has been made under this section for a taxable year,

(B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,

(C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and

(D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.

■■■ The provision exists to remedy "grave injustice." *Hayman v. Commissioner*, 992 F.2d 1256, 1259 (2d Cir.1993). In order to qualify for innocent spouse status, a taxpayer bears the burden of proving *all* of the elements listed in § 6013(e). *Id.* However, "since this provision of the tax law is remedial in nature, it is construed and applied liberally in favor of the person claiming its benefits." *Friedman v. Commissioner*, 53 F.3d 523, 528–29 (2d Cir.1995).

The Commissioner does not contest the petitioner's claims under subsections A or B of § 6013(e): she and her former husband did file a joint tax return, and the "substantial understatement of tax" (based on unreported income of $32,940) is attributable solely to Harold Bliss. The tax court held petitioner liable on the ground that she had failed to make the requisite showing under subsection C. The tax court therefore found

it unnecessary to consider subsection D. On appeal, the tax court's findings of law are subject to *de novo* review, while its findings of fact are only disturbed if found to be "clearly erroneous". *Id.*

■■■ "In cases involving the omission of income, knowledge of the underlying transaction is sufficient to preclude innocent spouse status." *Id.* at 530. Such knowledge need not be complete, or even actual:

With respect to the taxpayer's reason to know, "the more a spouse knows about a transaction … the more likely it is that she will know or have reason to know that the deduction … may not be valid." In other words, the question is whether "a reasonably prudent taxpayer in her position at the time she signed the return could be expected to know that the return contained the substantial understatement."

*Hayman*, 992 F.2d at 1261 (quoting *Price v. Commissioner*, 887 F.2d 959, 963 n. 9 & 965 (9th Cir.1989)).[1] In this Circuit, a court making the assessment required by § 6013(e)(1)(C) must consider four factors:

(i) the spouse's level of education; (ii) the spouse's involvement in the family's business and financial affairs; (iii) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living and spending patterns; and (iv) the culpable spouse's evasiveness and deceit concerning their finances.

*Hayman*, 992 F.2d at 1261. Our consideration of these four factors is not rigid. *See Friedman*, 53 F.3d at 525 ("Extravagant tax savings may alert even a financially unsophisticated spouse to the possible improprieties of a tax scheme.") The interplay of these factors is dynamic, so that different factors will predominate in different cases. The central inquiry is whether " 'a reasonably prudent taxpayer' ", *Hayman*, 992 F.2d at 1261 (quoting *Price*, 887 F.2d at 965), would have knowledge of a substantial understatement.

---

1. As we recently acknowledged, omission of income cases are treated differently from deduction cases under § 6013. In deduction cases,

*knowledge* of the underlying transaction alone is not sufficient to preclude innocent spouse status. *Friedman*, 53 F.3d at 530.

Petitioner emphasizes that, at the time of the divorce, she had only a limited education (*Hayman* factor one), had had little to do with the family finances (*Hayman* factor two), and had not witnessed "lavish or unusual" expenditures (*Hayman* factor three). We consider such factors because, ordinarily, they predict what a prudent person would realize regardless of the other spouse's evasiveness or deceit. The predominant variable here, however, is the level of Harold Bliss's disclosure (*Hayman* factor four). Where one spouse is cunning and systematic in concealing the understatement of taxes (in order, for example, to support an addiction or another ménage), the other spouse may plausibly claim innocence notwithstanding some educational attainments or some involvement in family financial affairs that are distinct from the understatement of taxes. Here, however, petitioner's husband practiced no "evasi[on]" or "deceit" concerning the couple's finances.

Based upon credible testimony and documentary evidence, the tax court found that petitioner's attorney had received copies of West and Bliss financial material *and* had passed this information on to petitioner. A. 127. This material does not disguise the fact that a significant portion of Harold Bliss's income during 1982 came in the form of the "loans" from West & Bliss. The petitioner contends that she never saw the documents sent by Harold Bliss to her lawyer. The tax court's contrary finding is not clearly erroneous, however.[2] In any event, it is uncontested that the petitioner was present at the December 8, 1982 settlement meeting at which her lawyer negotiated the agreement to limit her additional 1982 tax liability to $5,500. Her equivocal testimony in the tax court allowed the fact finder great latitude. She knew the meeting "had something to do with taxes but I don't know exactly what." A. 87. She had discussed the tax issue with her lawyer, but "I was real stressed and upset and nervous and I was more or less just sitting there and when it was over I just talked to [my divorce lawyer] a little bit about what, you know the tax thing." A. 108

The tax court committed no clear error in concluding that the petitioner knew or should have known that her obligation to pay an additional $5,500 toward the couple's future tax liability had to do with the fact that Harold Bliss had received money from his law firm that had not been reported as income to the IRS and from which taxes had yet to be withheld. When she signed the 1982 tax return six months later, she should have been surprised to learn that, instead of owing additional taxes (to which she would be contributing up to $5,500), she and her former husband were actually splitting a refund (of which her share was approximately $3,440). Petitioner thereby shared 50–50 in the benefit derived from the understatement in taxes. "A spouse cannot harbor doubts about the accuracy of a return and then turn a blind eye toward it." *Stevens v. Commissioner*, 872 F.2d 1499, 1507 (11th Cir.1989).

There can be little doubt that the petitioner gained "knowledge of the underlying transaction" that produced the omitted income. *See Friedman*, 53 F.3d at 530. In the divorce proceedings, her husband was called upon to disclose the details of his financial life, and it is not claimed that he concealed any relevant information from the petitioner and her counsel. Based on his disclosure, the prospective divorcees stipulated to the allocation of responsibility for the additional taxes, and (after the return was filed with the substantial understatement) they shared the unanticipated refund.

The dissent recognizes that the petitioner had the burden of showing that "she had no knowledge of the transaction underlying the understatement of tax," *post* at 381, citing to *Hayman*, 992 F.2d at 1261, and supposes that "it was the conversion of the loans into income by determining not to repay them that is the taxable transaction in this case." *Post* at 381. However, the taxable transaction in this case was Mr. Bliss's income from his law firm. That income was not concealed from the petitioner. The dissent emphasizes that she was a housewife without a financial

2. This case does not require us to consider whether her lawyer's knowledge and understanding should be imputed to the petitioner.

background. But no one argues that a person so situated lacks interest in the amount of her spouse's income, or lacks the mental capacity to absorb that information when it is disclosed; instead, the dissent argues that the petitioner lacked the capacity to appreciate the characterization of Mr. Bliss's income as loans, and the tax consequences of that. However, at the time of the divorce proceedings, the only taxable transactions were the sums of money that Mr. Bliss drew from his law firm. The effort to convert some of that income into loans was done in two steps. First, the payments were recorded as loans on the ledger; but the dissent doubts that she was "apprised even of the existence of the loan account by her divorce lawyer...." *Post* at 381. Second, Mr. Bliss gave a note for that money to his firm on December 31, 1982; but that was after the divorce negotiations. In short, the less the petitioner understood about high finance, the less she would have focused on the loan arrangement deemed so complex by the dissent, and the more clear it should have been to her that the actual family income in 1982 was not radically reduced from what they had reported the year before.[3]

The petitioner claims to be more benighted than she was. The petitioner argues that she had no more than a high school education; but many taxpayers without a high school diploma understand that taxes are paid on income. She claims that she was largely uninvolved in the family's finances; but she supplied data used by her husband to claim deductions, and therefore cannot claim a purely passive role as signer of the tax forms. "The 'innocent spouse' exemption was not designed to protect willful blindness or to encourage the deliberate cultivation of ignorance." *Friedman,* 53 F.3d at 525.

Because we agree with the tax court that petitioner has failed to satisfy provision C of § 6013(e)(1), we need not consider the merits of the issues associated with provision D.

3. According to the dissent, the petitioner should be deemed innocent because she is guileless and may not have understood why Mr. Bliss should have reported his full income. This misapprehends the nature of innocence in the context of this statute. Innocent people pay taxes; the obligation to pay taxes rests on liability, not guilt. An innocent spouse within the meaning of this statute is innocent vis-à-vis a guilty spouse whose income is concealed from the innocent and spent outside the family.

## CONCLUSION

For the foregoing reasons, the decision of the tax court is affirmed.

OAKES, Senior Circuit Judge, dissenting:

I dissent. I think the tax court was unduly restrictive in construing the "innocent spouse" statute and that it drew erroneous inferences regarding the knowledge that Janet Bliss in particular, and persons in the midst of divorce in general, are likely to have regarding the finances of their about-to-be-ex-spouse.

In my view, the evidence showed that Janet Bliss did not, and reasonably could not, focus on the tax consequences of Harold Bliss's arrangements with his law firm as the final arrangements for the divorce were underway. Tax Court Judge Whelan stated on the record that even if he did "believe that Mrs. Bliss was perfectly innocent and trusting" and "that that continued fully throughout the year 1982 while the divorce proceedings were ensuing on the fond hope that they would get back together," he "would also have to believe that her lawyers didn't say, 'Now we're going to get that loan account,' and, you know, clearly that's income and that her lawyers, either by—you know, either they didn't know or they goofed up and they didn't tell her." Trial Transcript at 294–95.

The judge went on to add, I think quite improperly, that, "It's very difficult to believe that somebody would have exhibited this much lack of interest in—or curiosity about the financial affairs of somebody who was obviously not a very nice person, at least from their vantage point." *Id.* at 296. I had thought that when Congress enacted the Innocent Spouse Statute it was to correct unfair prior caselaw that held innocent spouses liable for the tax consequences of their partners' misdeeds, and "to bring government tax collection practices into accord with basic principles of equity and fairness." H.R.Rep.

No. 1734, 91st Cong.2d Sess. 2 (1970). *See Price v. Commissioner*, 887 F.2d 959, 963 n. 9 (9th Cir.1989); *see also Sanders v. U.S.*, 509 F.2d 162, 169 n. 14 (5th Cir.1975).

In my view, Janet Bliss showed that she did not know of the understatement of tax on the joint return filed for 1982, that she had no reason to know of such understatement, and that it would be inequitable to hold her liable for her husband's conversion of loan accounts into salary by virtue of failing to repay the loan. The majority opinion here, in my view, compounds the tax court's problem by not facing the question "whether her lawyer's knowledge and understanding should be imputed to the petitioner," *supra* at 379 n. 2, and resting on a supposed conclusion of the tax court that she knew or should have known that her obligation to pay up to $5,500 toward the couple's future tax liability had to do with the fact that Harold Bliss had received money from his law firm that had not been reported as income to the I.R.S. and from which taxes had yet to be withheld. *Id.* at 379.

The most that could be said, it seems to me, is that she knew of the loans, but it was not the loans which gave rise to the understatement of income; rather, it was the conversion of the loans into income by determining not to repay them that is the taxable transaction in this case. There is nothing in this record which shows that Mrs. Bliss had knowledge of the conversion.

Beyond this, Janet Bliss's uncontradicted testimony was that she did not see any documents indicating the existence of the loan accounts themselves. Even though there were letters indicating the existence of the loan account that were mailed to her, she certainly did not, and had no reason to, examine the ledger sheet purporting to evidence the account because, like most people in her situation, she relied on her divorce lawyer in connection with financial matters. Beyond that, the documents that were delivered to her attorney were much too complicated to give her knowledge of anything and, indeed, the documents overall showed that Harold Bliss's income for 1982 was probably going to be significantly less than it had been for 1981. Moreover, Exhibits 8H and 10J, which were divorce-case documents and consist of the spouse's affidavit of income and expenses on order to show cause prepared by Harold Bliss and a joint pretrial statement in the matter, tried on the 8th day of December, 1982, bear handwritten notations "cc 1–12–83," indicating that they were delivered to petitioner, if at all, after the court hearing in December.

Not only did she say that she did not read these documents and did not understand financial matters so as to rely on her attorney, most of the financial information was received by her after the terms of the divorce had been agreed upon. I find it unreasonable to assume that she would have looked at the papers at that time or until, in fact, her ex-husband failed to pay support some three years later, long after the 1982 tax return had been filed.

Petitioner as of 1982–83 was a woman of limited educational background, with next to no experience in financial matters, who let her husband run things in the marriage and particularly financial matters. Yet, the tax court held, and the majority sustains its position, that such a housewife should have determined that the loan entries later might represent taxable income. Her entire burden, however, is only to prove that she had no knowledge of the transaction underlying the understatement of tax. *Hayman v. Commissioner*, 992 F.2d 1256, 1261 (2d Cir. 1993); *Price*, 887 F.2d at 963 n. 9. She testified, without contradiction, that she was not apprised even of the existence of the loan account by her divorce attorney, and the attorney himself could not recall if he had ever spoken to her concerning the loans, and testified that he did not spend any significant time with her, and did not recall going over any of the financial documents with her at any time until they went back to court in connection with a modification of the decree some three years after the divorce.

Because she had to pay up to one-half of 1982 income taxes, not to exceed $5,500 by virtue of clause 24 of the separation agreement, and the returns as filed showed tax liability of $12,620 on the federal return or slightly more than the $11,000 tax liability threshold referred to in the separation agree-

ment, nothing would alert her to any "funny business" when she signed the returns. When in fact she received half of the refund, this must have been a happy event, not one calling for a further look.

In short, there is simply nothing in this record to show that petitioner had reason to know of the understatement of tax: Janet Bliss was totally uninvolved in her husband's business, there was no indication that family expenditures exceeded reported income, nor were there lavish or unusual expenditures (at least any known or visible to her). It seems to me that this is the classic case of an "innocent spouse." The panel majority's definition of an innocent spouse is one "vis-à-vis a guilty spouse whose income is concealed from the innocent and spent outside the family." That is exactly what Harold Bliss did: concealed in part his law firm income from the government and his spouse by a phony loan account, and then spent the money thereby "saved" outside the family.

Accordingly, I dissent.