T.C. Memo. 2012-339

UNITED STATES TAX COURT

ALLISON T. O'NEIL, Petitioner, AND MICHAEL J. O'NEIL, Intervenor <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 28711-09.                            Filed December 4, 2012.

<u>William Edward Taggart, Jr.</u>, and <u>Barbara N. Doherty</u>, for petitioner.

Michael J. O'Neil, pro se.

<u>Daniel J. Parent</u>, for respondent.

MEMORANDUM OPINION

HOLMES, <u>Judge</u>:  Allison T. O'Neil, the ex-wife of Michael J. O'Neil, does

not want to pay a penny of their joint 2005 federal tax liability because, she says, it

[*2] would be inequitable to make her do so. What makes this case a little bit different is that the tax liability Allison seeks to escape has already been paid.

Background

The O'Neils met over drinks at the University of California, Santa Cruz, and soon married. Michael, who earned his degree in environmental design and architecture, went into business for himself; Allison, who earned her degree in environmental studies, started out working for a camera store and a law firm, doing secretarial work and light bookkeeping--at least until their kids, now 22 and 20, were born.

Allison started working inside the home and raised the children, kept track of the household finances, and occasionally helped Michael with his books. They filed joint tax returns throughout their marriage, though they occasionally filed or paid late.[1]

Michael eventually became a real-estate developer, and got involved in Colorado projects that frequently took him away from home. By 2005, he was spending about eighty percent of his time there. The marriage became strained,

---

[1] The administrative record notes that the O'Neils have filed their taxes and paid late since at least 1998. It also notes that at the time Allison filed her first request for relief, she had filed her own 2006 income tax return late, despite receiving an extension.

[*3] and the O'Neils separated. Though their separation would turn into a divorce, the pair kept their family home in Orinda, an affluent suburb in the San Francisco Bay area, so their children could finish high school without moving.

Michael and his partners sold a large Colorado project to Pulte Homes in 2005. He received a net gain of $268,000 from the deal, and used the money to pay his own expenses and provide for Allison and the children.[2] What he didn't do was set aside enough for the IRS--in 2005 and 2006, the O'Neils made only three estimated tax payments toward their 2005 tax liability, and the payments added up to less than $7,000.

When it came time to file their 2005 income tax return, the O'Neils got an extension until October 2006, though they did not include payment of the $13,000 they estimated they would owe. Michael gathered much of the information the couple used to prepare their return, but Allison collected at least some, such as the mortgage interest they paid and charitable contributions that they made and certain investment income that they received. She sent what she got to Michael's accountant in Colorado. Michael sent two draft 2005 income tax returns back

---

[2] Michael recalls providing Allison with $6,000 to $10,000 per month. Allison recalls getting only $6,000 per month.

[*4] home, and Allison reviewed them. The couple also discussed their taxes and finances, even if not at great length.[3]

The O'Neils' Colorado gold soon turned to straw. One of Michael's partners sued him over the allocation of the partnership's profits, and in August 2006 a state court entered a $1.5 million judgment against him.

This pressed down on the O'Neils. In early October 2006, Michael gave Allison a draft return that differed substantially from the others--it reported the substantial additional income from the partnership's 2005 sale to Pulte Homes and showed about $70,000 in unpaid tax liability.[4] Allison reviewed the return, and challenged Michael about where this unexpected income came from. Her attorney reviewed the return, and she and her attorney both questioned Michael's accountant, who did his best to explain why the tax was due.

Neither O'Neil could pay that large a tax bill at once, and they had no specific plan for how to pay this liability later on. Michael, for his part, told

---

[3] Michael recalls several all-encompassing discussions. Allison categorically rejects this, and says that she and Michael rarely discussed his business, and that his secrecy contributed to their divorce. We find it more likely than not that the truth lies somewhere between.

[4] This was, of course, net of the $6,715 in estimated payments. The return shows total tax paid of $6,967, however, and the Commissioner concedes that $6,967 was the correct amount that was applied to 2005 when the return was filed.

**[\*5]** Allison that the additional income was an error and that he would get a different Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., that would negate the large tax liability. In October Allison signed the return and mailed it to the IRS. No payment accompanied it, and the IRS assessed the unpaid tax liability that it showed in November 2006.

The next May, while they were still married, the O'Neils refinanced their Orinda home; all $70,000 of the proceeds went for their own use: $50,000 went into an account for Allison to use to pay the Orinda home's mortgage, and $20,000 went to pay off credit-card debt. Even after this refinancing, though, the couple had perhaps $400,000 or more in equity.

Their divorce became final in August 2007, but the O'Neils left the division of their marital property unsettled. About nine days after the divorce, Michael's former partner--now his judgment creditor--recorded his judgment as a lien against the Orinda home. The IRS, impatient to collect the O'Neils' large tax debt, also began circling. It took a small tax refund and then, in 2008, put its own lien on the Orinda home. The IRS then levied on two bank accounts and took Allison's 2007 income-tax refund. Allison filed an application for innocent-spouse relief, while Michael sought refuge in a personal bankruptcy filing, only to have the IRS collect another $4,000 when his half interest in the Orinda home was sold.

**[*6]**   Allison wasn't doing too well with her request for innocent-spouse relief either.  The IRS preliminarily denied her application, and when she submitted additional information and an updated Form 8857, Request for Innocent Spouse Relief, an IRS Appeals officer sent her a final determination denying her relief because:

- she knew that the tax wouldn't be paid,

- she wasn't going to suffer an economic hardship, and

- she wasn't tax compliant.

Allison filed a petition in our Court while she continued to reside in Orinda.

After she filed but before we tried the case, the O'Neils finally sold the Orinda home.  Proceeds from the sale paid the overdue 2005 tax bill, with $30,000 left over that Allison put into a certificate of deposit.

The sale enabled the O'Neils to finish the division of their marital property. Allison moved into a townhouse in another Bay Area suburb that her former in-laws had bought and rented to her at a "considerable" discount.  After her kids turned eighteen, she stopped receiving child support, though she still receives a bit less than $600 per month in alimony, and earns $1,400 every two weeks as a legal secretary.  Her children attend the University of Colorado at Boulder, mostly paid

[*7 ] for by a 529 plan set up by Michael's relatives. She continues to claim them as dependents though, and the younger is expected to graduate in the spring of 2013.

She seeks a full refund of the tax paid from her half of the Orinda house proceeds as well as the much smaller amounts that the IRS took from her bank accounts and tax refunds that she otherwise would have received.

## Discussion

I.    Relief Under Section 6015

Married couples may file their tax returns jointly; but if they do, they are jointly responsible for the accuracy of the returns and jointly liable for the tax due. Sec. 6013(d)(3).[5] A spouse who signs a joint return may still try to escape joint liability. Two of the three escape routes in the Code--in section 6015(b) and (c)--are blocked for Allison because they require a "deficiency" or "understatement" and the Commissioner alleges neither here. Allison still may qualify for relief, but she must do so only under section 6015(f). If Allison qualifies for that section's "equitable relief," she may receive a refund for any levy from her separate

---

[5] All section references are to the Internal Revenue Code in effect at all relevant times, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*8]** property.[6]  Sec. 6015(g); <u>Ordlock v. Commissioner</u>, 126 T.C. 47, 57 (2006),

<u>aff'd</u>, 533 F.3d 1136 (9th Cir. 2008).

Section 6015(f) allows the IRS to grant relief from joint and several tax

liability to a spouse if it would be "inequitable" to hold that spouse liable.  The

Commissioner maintains here the same objections to our Court's review of his

determinations in cases like this that he raised in <u>Wilson v. Commissioner</u>, T.C.

Memo. 2010-134, which is still pending on appeal before the Ninth Circuit, <u>appeal</u>

<u>docketed</u>, No. 10-72754 (9th Cir. Sept. 10, 2010).  We note his objections; namely,

that we should review his determination only to see if he abused his discretion and

look only at the administrative record, but we are bound by precedent to analyze the

case using the evidence in the trial record and without deference to the

Commissioner's determination.  <u>See</u> <u>Porter v. Commissioner</u>, 130 T.C. 115, 117

(2008) (scope of review); <u>Porter v. Commissioner</u>, 132 T.C. 203, 210 (2009)

(standard of review).  Because of the current uncertainty of this area of law in a case

appealable to the Ninth Circuit, however, we will also analyze the facts in the

administrative record using an abuse-of-discretion standard.

---

[6] There is some dispute regarding what levies came out of Allison's separate property.  The Commissioner contends that the June 2008 payment of $896.24 and an August 2008 payment of $178.57 came from a joint account with Michael, and are unavailable for refund.  Allison argues that the accounts belonged only to her following the 2007 entry of her divorce.

**[*9]**   A.    The Safe Harbor

The IRS uses specific guidelines, Rev. Proc. 2003-61, 2003-2 C.B. 296,[7] to determine whether it would be inequitable to hold a spouse jointly liable for a given tax debt.  The revenue procedure lists seven threshold requirements for equitable relief, which both parties agree Allison meets.  See id. sec. 4.01, 2003-2 C.B. at 297-98.  It then lists three "safe-harbor" factors, and a spouse who can show that she has stowed all three aboard her ship can sail safely home to win relief.  See id. sec. 4.02, 2003-2 C.B. at 297-98.  For Allison, the safe harbor would require proof that

- she was divorced or separated from Michael on the date she requested relief;

- when she signed the 2005 tax return she didn't know (or have reason to know) that Michael wouldn't pay the tax liability; and

- she will suffer economic hardship if the IRS doesn't grant her relief.  Id.

Of the three conditions, the parties dispute only the last two, and we need to look at only one--Allison's knowledge of whether her ex would pay the tax liability.

---

[7] The Commissioner is drafting a new revenue procedure to supersede 2003-61, see Notice 2012-8, 2012-4 I.R.B. 309, but we agree with the parties that Rev. Proc. 2003-61 controls this case.

**[*10]**   The revenue procedure tells us to gauge Allison's knowledge on the date she signed the joint return, and tells us to ask whether on that date Allison knew or should have known that Michael wouldn't pay the tax liability.  She must in fact establish "that it was reasonable for [her] to believe that [Michael] would pay the reported income tax liability."  Rev. Proc. 2003-61, sec. 4.02(1)(b), 2003-2 C.B. at 298.  Allison admitted during the Appeals process that she knew Michael wouldn't and couldn't pay, and reiterated these facts at trial.  She nevertheless alleges that this factor still favors her.  The Commissioner sees things differently.

Allison parses the knowledge factor closely.  She admits she knew Michael wasn't going to make a payment when they filed their return, because she knew that they didn't have enough cash on hand for such a big payment.  Yet she claims that she shouldn't be charged with this knowledge because Michael assured her that the income reported on his Schedule K-1--the income giving rise to the substantial liability--was incorrect.  She claims she believed Michael's representations, and his implicit promise to take care of the potential liability--after all, they had always paid their taxes until this point.  Thus, she says, Michael misled and "tricked" her into signing the return.

While there is some evidence that Michael was not always forthright with his ex about his business and personal affairs, there is no doubt that the O'Neils were

[*11] routinely tardy in filing their returns and paying their taxes. This made her aware of their need to file immediately when presented with the changed return, lest they get penalized for not filing on time.

More important even than this is that by October 2006, when they filed their 2005 tax return, Allison didn't trust her estranged and soon-to-be-ex husband. She recounted frustration with his growing detachment and evasiveness as early as 2002, frustration so great that she sought medical help. This was not surprising, for by that time Michael was spending less and less time at home, and Allison was tired of dealing with the resulting stress and isolation. When Michael gave her the changed return in October 2006, Allison consulted her attorney and spoke with both Michael and his accountant before signing. She questioned them specifically about the increased income, and she knew that Michael couldn't pay the tax. She knew that she couldn't pay the tax. And she knew that her husband had just lost a very large lawsuit against an estranged former business partner. We therefore do not find credible her claim that she trusted Michael to make the liability "all go away." Such a belief could not possibly have been reasonable under the circumstances.

Even if we were limited to reviewing the Commissioner's determination on this factor for an abuse of discretion, upon the administrative record only, we

[*12] would not find in Allison's favor on this factor. The innocent-spouse relief application asks the question "[w]hen the returns were signed, did you know any amount was owed to the IRS for those tax years?", and she checked the "yes" box. She explained that she knew the liability stated on the 2005 return was "large" and also "unpaid", but Michael assured her that they would amend their return and the tax liability would "disappear". She clearly balked at this suggestion, because she added on her application that Michael "pressured me into signing by pointing out that if I did not agree to sign the return, no return at all could be filed and we would be in trouble." On the basis of these statements, the Commissioner preliminarily determined that Allison knew that the tax wouldn't be paid.

Allison contested this conclusion when she sought review within the IRS. She again admitted she knew that the tax wouldn't be paid when the couple filed, but claimed that Michael was "menacing" and deceitful in that he seems to have told her that he was either going to file an amended return or receive an amended Schedule K-1 that would eliminate the tax due. We also agree with the Commissioner that Allison never established that she was actually deceived into thinking that either approach would work. (In fact, when Michael did present her with an amended return nearly a year later, she wouldn't sign it unless he paid the

**[\*13]** stated liability himself, in full--this despite the liability shown on this amended return's being nearly $60,000 less than that shown on the couple's filed return.)

Since Allison cannot demonstrate under either standard or scope of review that she reasonably believed Michael would pay the tax liability, she cannot qualify for safe-harbor relief.

This doesn't end our discussion, however.

B.      Section 4.03: Facts-and-Circumstances

Even if a spouse cannot dock in the safe harbor, she can still try to show that she should win relief under a multifactor balancing test. See Rev. Proc. 2003-61, sec. 4.03, 2003-2 C.B. at 298-299. For this test, we evaluate a "nonexclusive" list of factors, including extra factors the parties note, described below in table form (we've italicized the factors not in dispute):

| Weighs for Relief | Neutral | Weighs Against Relief |
| --- | --- | --- |
| *Separated or divorced* | Still married | N/A |
| Economic hardship | N/A | No economic hardship |
| Didn't know or have reason to know that Michael wouldn't pay the liability | N/A | Knew or had reason to know that Michael wouldn't pay the liability |

| [*14] Michael was legally obligated by agreement to pay the liability himself | *No divorce or other agreement allocating the liability* | Allison was legally obligated by agreement to pay the liability herself |
| --- | --- | --- |
| No significant benefit | N/A | Significant benefit |
| Allison was individually tax compliant | N/A | Allison not individually tax compliant |
| Abuse present | No abuse present | N/A |
| Allison in poor mental or physical health | Allison not in poor mental or physical health | N/A |
| O'Neils paid tax liability when they had first opportunity to do so | N/A | O'Neils failed to pay tax liability when they had first opportunity to do so |

Allison, for her part, also argues that disallowing her relief will give her ex-husband an undeserved financial windfall. The parties don't dispute that Allison is divorced, and no agreement allocates the tax to either Allison or Michael, a neutral factor.

We discuss the additional factors--Allison's knowledge being both a safe-harbor and a balancing-test factor about which the parties disagree.

Economic Hardship

Allison argues that her age, earning potential, and low monthly income show that she has "at all times since filing her request for relief" suffered economic

[*15] hardship. She argues that the IRS's calculation of her income shortfalls was in error. She also notes that because of the levy, she has insufficient money to retire.

The standard for an economic hardship is more rigorous. There is a regulation, section 301.6343-1(b)(4), Proced. & Admin. Regs., that explains what "economic hardship" is. See Rev. Proc. 2003-61, sec. 4.02(1)(c). It tells the Commissioner to find that a levy would create a hardship "if satisfaction of the levy in whole or in part will cause an individual taxpayer to be unable to pay his or her reasonable basic living expenses." Sec. 301.6343-1(b)(4), Proced. & Admin. Regs. The Commissioner must look at all of the relevant facts--including assets available to satisfy the liability. See id.; see also, e.g., Wiener v. Commissioner, T.C. Memo. 2008-230, 2008 WL 4568030, at *14.

This regulation constrains our ability to find for Allison: Since the O'Neils' joint tax debts have been completely paid, we must ask whether the levies that satisfied these debts caused Allison to be unable to pay her reasonable living expenses. Given that she still has at least $55,000 in liquid assets,[8] Allison has a substantial burden to meet.

---

[8] This is the total of the $30,000 certificate of deposit she got from the sale of the house and the $25,000 she got in the divorce, all of which she apparently is still saving for her retirement.

**[\*16]**  Her position is also undermined by the fact that she began experiencing economic problems long before the levies began--no later than 2007.[9]  This means the levies did not create these problems--which arose due to extraneous factors, such as her divorce, expensive medical bills, and the cost of keeping up the Orinda home on a part-time salary.  She carefully notes that she "suffers from" economic hardship, but not that the IRS levies would have "cause[d]" her to suffer an economic hardship.  A levy can of course exacerbate hardship it might not cause, as Allison contends.  She argues that the levies would have caused her economic hardship had they been levied from her monthly income.  But of course, they weren't.  By the time of trial, the tax liability had been paid in full, and almost none of it came from her monthly income.[10]

---

[9] During the May 2007 refinancing of the Orinda home, the O'Neils set up an "escrow account" for Allison to use to pay the balance of the mortgage.  She testified at trial, and referred during the Commissioner's review of her section 6015 claim, to taking $2,000 per month out of this account until it was exhausted.  She also credibly testified that the monthly withdrawals were used only to supplement her earnings, child support, and alimony in meeting household expenses, specifically the mortgage.

[10] $6,715 came from estimated tax payments that Michael and Allison made while they still jointly managed their finances, $439 was satisfied when the IRS took Allison's 2006 separate tax refund, $1,837 was satisfied by Allison's 2007 tax refund, and another $600 was satisfied by her stimulus payment.  During Michael's personal bankruptcy, the IRS got another $4,736.  The IRS also used $99,497 from the sale of Allison's interest in the Orinda home.  In fact, only $1,075 came from

(continued...)

[*17]   And the lion's share of the tax liability was paid by the sale of an asset, her interest in the Orinda home, that Allison was not using to pay her living expenses. (She admits as much now:  She wanted to save the proceeds from the Orinda home's sale--and did save the portion she received--for her retirement.)  She offers no explanation for how the Commissioner's lien on this asset, and its use to pay her tax liability, caused or aggravated her inability to pay reasonable living expenses.[11]

---

[10](...continued)
joint and/or separate bank accounts.  See supra note 6.

[11] One interchange at trial is particularly telling in this respect.  After describing to the Commissioner's counsel that her son's 529 plan had run out shortly before he graduated from college, she noted that "I don't have any money to help him."  In response to further questions, she remarked that her daughter's 529 would soon run out as well, and short of her expected graduation date.  The trial transcript then records the following:

Q:      So you need the refund in order to fund their college education?

A:      Well, I need the refund to be able to pay my bills and live my life.

Her lack of concern for her immediate financial well-being is likewise apparent later on:

Q:      And if you don't receive that refund, are you going to be able to continue to live in the house you're in?

A:      For a while.  But I'll, you know, never get to retire.

Q:      Are you going to be able to keep your car?

(continued...)

**[\*18]** She also argues that the IRS's satisfaction of the joint tax liability from the Orinda home's sale proceeds will cause her to suffer economic hardship in the future. But she cites no authority to support her assertion that we ought to consider a levy's impact many years down the line. And we've already held that the Commissioner is explicitly allowed to consider a person's nonexempt assets when he determines whether to grant relief. See, e.g., Wiener, 2008 WL 4568030, at \*14.

Allison also contests the income side of the Commissioner's calculation--she says that the IRS miscalculated her monthly income and concluded incorrectly that she was not currently depending on her savings to make ends meet.[12] We found her credible in some of the details in her description of her income and expenses, but she misses the bigger issue: Her available assets at the time her relief was denied.[13]

---

[11](...continued)
A:      Yes, as --

[12] The Commissioner, for his part, also points out errors with Allison's calculations, which she concedes.

[13] She has not dipped into her savings. Yet she claims to have run monthly budget deficits ranging from $90 per month in August 2008 to $573 or more per month in July 2009 to $1,297 per month immediately before trial. The record lacks any explanation of how she could continually run such large deficits while her savings remained almost entirely untouched. She does acknowledge possibly receiving $500 per month in "gifts" from her ex's relatives, but she doesn't

(continued...)

**[*19]** We don't know how much the house was worth at that point. But we do know that she had no less than $159,000 in assets immediately before the sale (her $134,000 portion of the Orinda home's equity plus the $25,000 payment from divorce).[14] We will not ignore these assets to focus on her monthly income alone.

She also implores us not to deny her relief and allow her ex-husband an "undeserved financial windfall." We appreciate she considers it unfair that she is left to pay almost all of her and her ex-husband's tax debt. The law is clear, however: Spouses who jointly file are jointly liable for the debt. The propriety of this rule is not before us, and it's up to Congress to change it, not the courts. It has no bearing on whether the IRS's levies caused Allison economic hardship. On balance, this factor isn't in Allison's favor.

Our conclusion doesn't change if we review the Commissioner's determination for abuse of discretion. The final determination of this factor

---

[13](...continued)
 include these in her calculations. She also omitted extraordinary expenses, which, according to her testimony, were the cost of her childrens' schools, and their flights home, computers, etc. We can only infer, lacking any explanation to the contrary, that the bulk of the "support" she claims she provides her children while they attend school is actually reimbursed by relatives.

[14] Her assets at their postassessment peak could have totaled more than $194,000 because of her half share of the additional $70,000 in equity she and Michael pulled out of the Orinda home.

[*20] concurred with the preliminary determination, and verified that Allison wouldn't suffer economic hardship if forced to pay the 2005 tax liability. It considered her monthly income much as we just did, but also noted that she was joint owner of a house allegedly worth $1.1 million according to her statement at the Appeals conference. It was no abuse of the Commissioner's discretion to consider this sizeable nonexempt asset when it determined Allison's ability to pay without suffering economic hardship. This factor weighs against her no matter our scope and standard of review.

### Significant Benefit

The Commissioner now alleges that Allison will benefit beyond ordinary support by receiving a refund of the Orinda home sale proceeds. He argues that she benefits by being able to use this money in the future to retire rather than paying her tax debts now, and implies that retirement funds don't count as "normal support" within the meaning of the revenue procedure. Allison counters that the income giving rise to the tax liability went to pay Michael's own expenses, and that she didn't receive any other financial windfalls from Michael's income.

Allison's characterization twists this factor a bit. It is true that Michael used the proceeds from his partnership's big sale to Pulte to pay his expenses. But he also testified that he used part of the money to support Allison and their children,

**[\*21]** and to pay the mortgage on the Orinda home. Michael was without doubt the biggest source of income for the family in 2005, and money is fungible, so we find that Allison did in fact benefit, directly or indirectly, from the underlying income. Whether this benefit was "normal" is another question.

Allison already cashed out in part when she and her husband refinanced the Orinda home to enable her to continue to work only part time, to keep her in the house, and to pay off credit-card debt. And here the Commissioner again notes that Allison intended to use the Orinda home's sale proceeds only to fund her retirement. While a home may not be "beyond normal support," retirement funds can be. See George v. Commissioner, T.C. Memo. 2004-261, 2004 WL 2601319, at \*5. Reviewing the notice of determination *de novo*, we agree with the Commissioner that this factor weighs against relief.

In the notice of determination, however, the Commissioner concluded that this factor neither favored nor disfavored relief, but was neutral. He didn't make the more detailed argument he makes now, but noted that Allison got $6,000 in monthly support from Michael, and that "[i]t is unclear if the size of the monthly payment is related to the failure to pay income tax for the year." The Commissioner couldn't conclude, using the evidence Allison gave him in the

**[\*22]** administrative record, that she wouldn't have received less support from Michael if the couple had paid their taxes.

This conclusion was not an abuse of discretion.  Allison said Michael provided her $6,000 per month "[f]rom 2001 forward," but there is no evidence in the administrative record substantiating this statement.  Without knowing whether the support Michael provided Allison increased as a result of the couple's not paying their 2005 tax liability, the Commissioner couldn't tell whether the support was ordinary or atypical.  He was well within his discretion to conclude this factor was neutral.

In sum, under a *de novo* review, we conclude this factor disfavors relief; and on the record available to the Commissioner, he didn't err to conclude it was neutral.

Compliance With Tax Laws

Though the administrative record suggests otherwise,[15] the Commissioner concedes now that Allison is compliant with her post-2005 tax obligations.  But he argues that even if Allison is compliant, the factor doesn't weigh in favor of relief, but is only neutral.  He cites Billings v. Commissioner, T.C. Memo. 2007-234, Albin v. Commissioner, T.C. Memo. 2004-230, and Keitz v. Commissioner, T.C.

---

[15] See supra note 1.

**[\*23]** Memo. 2004-74, in support of his argument, but notes that each involved Rev. Proc. 2000-15, 2001-1 C.B. 447.

Revenue Procedure 2000-15 differs from Revenue Procedure 2003-61. The earlier procedure divided its facts-and-circumstances approach into "factors weighing in favor of relief" and "factors weighing against relief." Rev. Proc. 2000-15, sec. 4.03(1) and (2), 2000-1 C.B. at 448-449. The compliance-with-the-tax-laws factor used to be listed only in the "factors weighing against relief" category.

Under the current revenue procedure, we have routinely noted that a taxpayer's later compliance with her obligation to file returns and pay her taxes weighs *in favor* of relief. See, e.g., Pullins v. Commissioner, 136 T.C. 432, 452-53 (2011); see also, e.g., Downs v. Commissioner, T.C. Memo. 2010-165, 2010 WL 2990297, at \*4. The Commissioner's legal argument does not persuade us, and goes against precedent that we must follow. Given that the Commissioner concedes Allison was compliant, we must conclude this factor weighs in her favor.

Even if we reviewed the Commissioner's determination only for abuse of discretion and confined ourselves to the administrative record, the factor would still favor Allison, because at Appeals the IRS concluded that the "factor [was] favorable for relief" when it issued the notice of determination. It's only now that the Commissioner asks us to reconsider this finding. A more limited review will

**[\*24]** not overturn this conclusion, because the Commissioner does not now argue he abused his own discretion by concluding the factor favored Allison. Thus, under either standard of review, the factor favors Allison.

Abuse

While both parties agree that abuse may weigh in favor of finding relief, they look at the facts here quite differently. Allison suggests that Michael was abusive within the meaning of Rev. Proc. 2003-61 because he lied to her repeatedly, "emotionally and psychologically bullied" her, and threatened her with "trouble" if she didn't sign the return.

The Commissioner disputes this characterization of the O'Neils' relationship. He notes that there is no documented evidence of abuse. He notes that the "threat" Michael allegedly lobbed at Allison was based upon the couple's legal obligation to file and pay taxes, which Allison already knew. He observes that Michael was already separated from Allison by the time she signed the return--legally, and by substantial distance--and that she signed the return only after consulting with legal counsel, Michael, and his accountant.

We agree with the Commissioner. Allison appears not to have had a happy marriage with Michael. But we have no basis to find "bullying" or intimidation here--much less more substantial abuse of the sort we analyzed in Nihiser v.

[*25] Commissioner, T.C. Memo. 2008-135, 2008 WL 2120983, at *8-*11. This factor neither helps nor hurts Allison but is neutral.

This conclusion doesn't change if we adjust the scope and standard of our review. Apart from alleging that she was "psychologically and emotionally bullied," Allison introduced no evidence of abuse: The doctors' reports she provided noted only that she was prescribed antidepressants, and that Michael was "secretive," leading to great marital stress. She introduced no police reports, and no witness statements. We cannot say that the Commissioner erred when he concluded under the facts available to him at the time he made his final determination that Allison wasn't abused. This factor is neutral for Allison no matter which standard and scope of review we use.

### Mental/Physical Health

Where a spouse was in poor mental or physical health when she signed a return, the equities balance more favorably towards finding her eligible for innocent-spouse relief. See Rev. Proc. 2003-61, sec. 4.03(2)(b)(ii), 2003-2 C.B. at 299; see also Harris v. Commissioner, T.C. Memo. 2009-26, 2009 WL 275680, at *6. Allison introduced evidence at trial and during the Commissioner's administrative review that she has suffered physical hardship as a result of the stress of her divorce from Michael. She has been treated with antidepressants since

**[\*26]** at least 2002, and has seen a therapist for at least as long. The Commissioner contends that this mental condition wasn't a factor when she signed the return or applied for relief. We disagree, and note that Commissioner shows us nothing to controvert Allison's evidence for this factor. We conclude that the factor weighs in favor of providing her relief, tempered somewhat because she hasn't established that her depression is particularly debilitating. See Rev. Proc. 2003-61, sec. 4.03(2)(b)(ii).

The Commissioner had most of the evidence regarding Allison's health available to him at the administrative level, but concluded this factor didn't help her because Allison "[did] not indicate that the depression rendered her incapable of making a decision or from leading a 'normal life' [sic] incapable of fulfilling the role of wife, mother, and homemaker." We conclude differently on *de novo* review. There is nothing however, in the Commissioner's determination that is "arbitrary," "capricious," or without basis in fact or law: He simply weighs the evidence differently than we do, and concludes that Allison's depression isn't substantial enough to weigh in her favor, but is only neutral. Under the limited standard and scope of review, the Commissioner didn't abuse his discretion by concluding this factor was neutral.

[*27]      Failure To Pay in 2007

The Commissioner argues that we should also consider, as a special unlisted factor, the fact that the O'Neils could have paid their 2005 tax bill when they refinanced their home, but chose not to. This argument is similar to what we already assayed with regard to economic hardship, and relies on the same set of facts.

The Commissioner does make a good point, but we have already held that the fact that the liability was satisfied out of Allison's nonexempt assets weighs against finding for her. This doesn't leave us much room to find even more in the Commissioner's favor. To some small extent, however, what the Commissioner argues here raises issues regarding intent and timing. We agree with him that the O'Neils' decision not to pay their liability in 2007 when they seemingly could have shows that they either didn't intend to pay it or were trying to delay the day of reckoning. This made the Commissioner spend substantial additional effort to get this tax bill satisfied. He was compensated for his time by additional accrued interest, but the O'Neils' dodgery undercut the Commissioner's interest in an orderly, prompt, and efficient taxing system.

**[\*28]**   This unlisted factor weighs a little bit against finding relief.  Since the Commissioner never raised this argument during his administrative review, we won't analyze it under a limited standard and scope of review.

<u>Windfall to Michael</u>

Allison argues that it is inequitable to deny her relief where the denial will indirectly benefit her ex-husband.  While this unlisted factor has nothing to do with economic hardship, it is an "equitable" argument.  The problem for us is how to include it in our balance.

As we noted, the Code makes jointly filing spouses jointly liable for the tax.  Congress itself balanced the equities of this policy choice when it enacted section 6013(d).  The zero-sum problem that Allison highlights here applies to any ex-spouse who is held liable for the debts of the other ex-spouse.  This is a restatement of the general problem of how to disentangle the joint tax debt left over from a marriage-- the very problem that Congress addressed in section 6015.  When Congress has balanced the equites, it's not our place to rebalance.  This factor neither helps nor hurts Allison.

Allison never raised this argument during her administrative review, and as with the Commissioner's "failure to pay the liability when they could" argument, we won't evaluate this argument under a limited standard and scope of review.

[*29] II.    Conclusion

We have already concluded that Allison isn't eligible for relief under Revenue Procedure 2003-61's safe harbor because the knowledge factor weighs against her. Under *de novo* review, the factors weighing in favor of and against relief are as follows:

| Weighs for Relief | Neutral | Weighs Against Relief |
|---|---|---|
| Separated or divorced | | |
| | | No economic hardship |
| | | Knew or had reason to know that Michael wouldn't pay the liability |
| | No divorce or other agreement allocating the liability | |
| | | Significant benefit |
| Allison was individually tax compliant | | |
| | No abuse present | |
| Allison in poor mental or physical health | | |
| | | O'Neils failed to pay tax liability when they had first opportunity to do so |

[*30]   If we were limited to reviewing the Commissioner's determination for abuse of discretion based entirely on the administrative record, the factors would weigh as follows:

| Weighs for Relief | Neutral | Weighs Against Relief |
|---|---|---|
| Separated or divorced | | |
| | | No economic hardship |
| | | Knew or had reason to know that Michael wouldn't pay the liability |
| | No divorce or other agreement allocating the liability | |
| | Not clear whether benefit was significant or not | |
| Allison was individually tax compliant | | |
| | No abuse present | |
| | Poor health is not a factor | |

We conclude, on balance, that she is ineligible for relief under Revenue Procedure 2003-61.  "As in any multifactor balancing test, we must have something in mind as the appropriate fulcrum when there are factors weighing down both sides of the lever."  Nihiser v. Commissioner, 2008 WL 2120983, at *13.  And here

**[\*31]** we can look to see if the economic unity of the household filing a joint return has been broken down by the actions of the nonrequesting spouse in a way that didn't allow the requesting spouse a reasonable exit. Id. As the Second Circuit once wrote, the innocence we look for "within the meaning of this statute is innocent vis-a-vis a guilty spouse whose income is concealed from the innocent and spent outside the family." Bliss v. Commissioner, 59 F.3d 374, 380 n.3 (2d Cir. 1995) (discussing former section 6013), aff'g T.C. Memo. 1993-390. The knowledge factor's unique importance, see Haggerty v. Commissioner, T.C. Memo. 2011-284, 2011 WL 6029929, at \*6; Bruen v. Commissioner, T.C. Memo. 2009-249, 2009 WL 3617592, at \*9, is, seen in this way, entirely appropriate because in the ordinary course of events knowing her husband is mishandling their joint return would allow a wife to begin to pull away from the entanglement of joint liability. We do find that the marital-status, compliance, and health factors weigh somewhat in Allison's favor, but the economic-hardship and significant-benefit factors, and especially the knowledge factor, weigh more heavily against her. When tax troubles engulfed the O'Neils, Allison could see them coming but chose to assume joint liability anyway.

We also cannot say the Commissioner abused his discretion in denying Allison relief. Confining our review to the administrative record would show that

**[*32]** the only factors in her favor were that she was divorced and that she complied with her tax obligations after 2005. That the levy wouldn't cause economic hardship because she had substantial nonexempt assets and that she knew or had reason to know Michael wouldn't pay the tax still tip the scales substantially against her. The Commissioner's conclusion was well within his discretion.

Finally, the record indicates, and the Commissioner confirms, that he received $104,240.67 from the title company upon the sale of the Orinda home. He likewise admits that he received $4,735.99 from Michael's bankruptcy, and that the payoff amount he provided the title company did not account for this sum. Furthermore, he shows that with the bankruptcy sums applied, the amount due immediately before the sale of the Orinda home was $99,496.89 ($104,232.88 - $4,735.99). This leaves a difference of $4,743.78 ($104,240.67 - $99,496.89) that Allison overpaid upon her sale of the Orinda home.

Given the slightly mixed result here,

                                                    An appropriate decision will be
entered.